# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00171-CV

**Appellants, William McMillin and Mary Furse//
Cross-Appellant, State Farm Lloyds**

**v.**

**Appellee, State Farm Lloyds//Cross-Appellees,
William McMillin and Mary Furse**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
### NO. GN200297, HONORABLE PATRICK O. KEEL, JUDGE PRESIDING

## O P I N I O N

Both parties appeal from a judgment based on a jury verdict awarding William McMillin and Mary Furse ("McMillins"[1]) $1000 for the breach of an insurance contract by State Farm Lloyds ("State Farm"), but rejecting several other damage claims by the McMillins. The McMillins complain about the district court's failure to strike six jurors for cause. They also complain that they are entitled to recover additional damages and attorney's fees. State Farm challenges the $1000 award and the award of statutory interest penalties. We will affirm the judgment in part, reverse the judgment in part, render judgment in part, and remand part of the cause for further proceedings.

---

[1] In their briefing, Mr. McMillin and Ms. Furse refer to themselves collectively as the "McMillins," and we do the same.

**BACKGROUND**

The claims underlying this appeal arose while the McMillins were renovating their house. The McMillins had removed a portion of the roof and covered the opening with tarp. On October 6, 2000, a storm hit and the tarp failed to prevent water from entering the house. The McMillins filed a claim with their homeowners' insurance carrier, State Farm, and, within a few days, State Farm made a payment of $2508.35 for viewable damage. Later that same month, after additional inclement weather, the McMillins reported additional water damage, along with mold growth throughout the house. Unlike the case with the McMillins' initial claim, several months passed before State Farm paid the second claims. On March 1, 2001, a mold remediator sent a fax to State Farm opining that remediation was so expensive that it was no longer cost-effective; State Farm did not share that estimate with the McMillins. On August 7, 2001, a week after getting another estimate from the mold remediator, State Farm paid $344,367.27 to the McMillins on their claim of water damage resulting in mold; thus, State Farm paid $346,875.62 to compensate the McMillins for their covered losses, an amount that excludes the $1000 deductible. By August 2001, the McMillins had purchased another home and moved there, partly in order to enable their planned adoption of a child to move forward.

The McMillins sued State Farm, asserting causes of action including breach of the insurance agreement, false, misleading or deceptive acts or practices and unconscionable acts in violation of the Deceptive Trade Practices Act ("DTPA"), *see* Tex. Bus. & Com. Code Ann. §§ 17.45(5) (West 2002), 17.46(a) (West Supp. 2004-05); unfair and deceptive acts or practices in violation of the insurance code, *see* Tex. Ins. Code Ann. art. 21.21 (West Supp. 2004-05); violation

2

of the "prompt pay" requirements of the insurance code, *see id.* art. 21.55, § 2; and breach of its common-law duty of good faith and fair dealing. The McMillins sought $5 million in damages, exemplary damages, attorney's fees, costs, and interest.

Both parties filed motions for partial summary judgment. State Farm moved for judgment that its policy expressly excluded coverage for remediation or repair of a home for damages caused by mold. The McMillins filed a cross-motion for partial summary judgment that the policy did not exclude coverage for remediation or repair of a home for damages caused by mold if that damage resulted from damages caused by water. The court granted the McMillins' motion and denied State Farm's motion.

The McMillins' claims were tried to a jury, which found that State Farm had failed to comply with its policy, but failed to find State Farm liable on any of the McMillins' other claims. The jury found that State Farm received all items, statements, and forms requested and required from the McMillins on July 31, 2001, which served as the trigger date for the deadlines for State Farm's duty to investigate, resolve, and pay claims promptly. *See id*. As damages for breach of the policy, the jury awarded the McMillins $1000 representing the amount, less amounts actually paid, that should have been paid under Coverage A Dwelling coverage; the court awarded $76.44 in prejudgment interest on this claim. However, the jury found zero damages for additional amounts that should have been paid under the policy's loss of use coverage and for reasonable and necessary expenses incurred in attempting to prevent further damage to the house.

3

**DISCUSSION**

Both parties appeal. In what they term their "Primary Issue," the McMillins urge that the district court abused its discretion in failing to strike six jurors for cause and that we should accordingly remand this case for a new trial. The McMillins also contend that the district court abused its discretion in failing to give a spoilation instruction as sanctions against State Farm for discovery abuse and spoilation of evidence that they claim prevented them from attacking State Farm's interpretation of their homeowners' policy at trial. The McMillins also present legal and factual sufficiency challenges to (1) the jury's award of zero additional living expenses under the loss of use provision of the insurance contract; (2) the jury's award of zero expenses incurred by the McMillins to prevent further damage; (3) the jury's finding that State Farm had received all items, statements, and forms requested and required from the McMillins on July 31, 2001; and (4) the jury's award of zero attorney's fees under the McMillins' breach of contract and Article 21.55 theories.

State Farm brings four issues, three of which attack the underpinnings of the jury's $1000 award on the McMillins's breach of contract claim relating to Coverage A. It first challenges the legal sufficiency of the evidence supporting the jury's decision to award the amount of $1000. In its second issue, State Farm contends that the district court erred in granting the McMillins summary judgment that mold damage was not excluded under Coverage A, and in denying State Farm summary judgment that such damage was excluded. In its third issue, State Farm argues that because mold damage was excluded from Coverage A, its payments to the McMillins for water damage were adequate and, thus, there was no evidence that it breached the policy contract. In its fourth issue, State Farm urges that the district court erred by awarding statutory interest penalties

4

under article 21.55 because the McMillins failed to offer evidence that they ever gave written notice, which State Farm contends was required by the statute.

**Challenges for cause**

The McMillins complain that the trial court abused its discretion by overruling their challenges for cause of six veniremembers who were seated on the jury.[2] State Farm argues that the McMillins neither preserved their complaints nor showed that the court abused its discretion by refusing to strike these jurors for cause.

*Preservation*

To preserve a complaint that the court abused its discretion in refusing to strike a juror for cause, a party must not only obtain an adverse ruling on their motion to strike, but must also "use a peremptory challenge against the veniremember involved," exhaust its remaining peremptory challenges, and notify the trial court that one or more specific objectionable veniremembers will remain on the jury list. *Cortez v. HCCI-San Antonio, Inc.*, 159 S.W.3d 87, 90-91 (Tex. 2005); *Hallett v. Houston Northwest Medical Ctr.*, 689 S.W.2d 888, 890 (Tex. 1985). These requirements derive from harmless error principles. Any error in a trial court's denial of a challenge for cause may be cured by the aggrieved party's using a peremptory challenge to strike the veniremember in question. *See Cortez*, 159 S.W.3d at 90 ("When a challenge for cause is denied, that error can be corrected by striking the venireperson peremptorily."). For this reason, the trial court's error would

---

[2] The McMillins also complained in their initial brief about a seventh juror, veniremember 34, but subsequently waived this complaint in response to the supreme court's opinion in *Cortez v. HCCI-San Antonio, Inc.*, 159 S.W.3d 87, 90-91 (Tex. 2005), discussed above.

5

be harmful to the aggrieved party only if it forced the party to accept an objectionable juror; *i.e.*, the party's use of a peremptory challenge to cure error leaves it without a sufficient number of peremptory challenges to strike a specific additional veniremember it finds objectionable. *See id.* at 90.[3] Consistent with general error preservation principles, *see* Tex. R. App. P. 33.1, the aggrieved party is required, before exercising its peremptory challenges, to alert the trial court that the court's ruling on challenges for cause was erroneous and harmful, thus affording the trial court the opportunity to consider the merits of that claim and to cure any error by such measures as granting additional peremptory strikes. *See Hallett*, 689 S.W.2d at 889-90;[4] *see also Texas Gen. Indem. Co. v. Moreno*, 638 S.W.2d 908, 912 (Tex. App.—Houston [1st Dist.] 1982, no writ) ("Prior to the time the peremptory challenges are made the complaining party has not been harmed by any unfavorable ruling. The harmful effect occurs only when an improper ruling forces the complaining party to

---

[3] Conversely, if the party, after expending a peremptory challenge on a veniremember it had unsuccessfully challenged for cause, had a sufficient number of peremptory challenges remaining to strike all other veniremembers it found objectionable, it would not have been harmed by any error in the trial court's denial of its challenge for cause.

[4] As the supreme court explained in *Hallett*:

> The refusal of the trial court to excuse an unqualified juror does not necessarily constitute harmful error. The harm occurs only if the party uses all his peremptory challenges and is thus prevented from striking other objectionable jurors from the list because he has no additional peremptory challenges. It is at this point that any harmful error occurs, i.e., when the court is made aware that objectionable jurors will be chosen. Thus, it is incumbent upon the complaining party to inform the trial court at the time of the error. Once informed, the court is able to determine if the party was in fact forced to take objectionable jurors.

*Id.* at 889-90.

accept undesirable jurors and no avenue of relief is available.") (cited with approval in *Hallett*, 689 S.W.2d at 889).

In this case, the McMillins made challenges for cause to several veniremembers that were overruled by the district court. Subsequently, before presenting their list of peremptory challenges to the district court, the McMillins' attorney reiterated some of these challenges while making the following statement on the record:

> Your Honor, because the Court refused to remove certain jurors for cause, the defendant will have no preemptory [sic] strikes left to challenge those objectionable panelists. And I will list them momentarily. To cure the error, the plaintiffs ask the Court to strike these following jurors for cause, or, in the alternative to grant plaintiffs additional preemptory [sic] strikes for each, starting with Juror No. 1, 5, 12, 14, 16, 29, 34, 36, 40, 41, 48, 50, and 54. And in that order of preference.

After the district court denied the McMillins' re-urged challenges for cause and request for additional peremptory strikes, the McMillins exhausted their six peremptory strikes[5] on veniremember numbers 7, 15, 22, 31, 37, and 38. Three of these veniremembers—15, 22, and 37—were among those whom the McMillins had unsuccessfully challenged for cause; the other three were not. The jurors ultimately seated included seven panelists whom the McMillins had moved to strike for cause and whom they had identified in their statement as objectionable jurors whom the court's rulings would force them to accept: numbers 1, 5, 12, 14, 16, 29, and 34.

The McMillins contend on appeal that the district court abused its discretion in refusing to strike for cause veniremembers 1, 5, 12, 14, 16, and 29. State Farm maintains that the

---

[5] *See* Tex. R. Civ. P. 233.

McMillins failed to preserve error regarding their challenges for cause to any of these veniremembers. We agree that the McMillins have waived error as to some of these veniremembers, but not all.

Under *Cortez* and *Hallett*, a party cannot demonstrate harm arising from a trial court's denial of a challenge for cause unless (1) the party first attempts to cure the error by using a peremptory challenge "against the veniremember involved" *and* (2) its use of the peremptory challenge causes the party to be unable to strike other objectionable jurors. *Cortez*, 159 S.W.3d at 90-91; *Hallett*, 689 S.W.2d at 889-90. Here, the McMillins used three of their peremptory challenges to strike veniremembers they had previously challenged for cause, 15, 22, and 37; they do not, however, appeal the district court's rulings regarding these veniremembers. But, rather than using their remaining three peremptory challenges to strike other veniremembers they had challenged for cause (and thereby remedy any error in the court's rulings regarding those panelists), the McMillins opted instead to strike veniremembers they had not previously challenged for cause. We believe that *Cortez* and *Hallett* required the McMillins to use their three remaining peremptory challenges on veniremembers they had challenged for cause in order to preserve error regarding the district court's denial of their cause challenges to those veniremembers. Their failure to do so waived error as to three of the six veniremembers they challenge on appeal.[6]

---

[6] We recognize that this conclusion may present difficult choices for trial attorneys, who must elect between using a peremptory challenge to preserve error on a challenge for cause versus using it to strike another veniremember whom the attorney may find even more objectionable. However, we are bound to follow *Cortez*. We also note that trial attorneys frequently face such strategic trade-offs between error preservation and the more immediate goal of winning at trial. *See generally* Jack Ratliff, *et. al*, Texas Courts: Trial & Appeal 1-3 (9th ed. 2003-04) (describing how "the advocate in a jury trial must cultivate a split personality," simultaneously pursuing the

But the McMillins have preserved error regarding the remaining three veniremembers they challenge on appeal. The McMillins had fewer peremptory strikes than the total number of veniremembers they had challenged for cause and, thus, could not possibly have used peremptory challenges against every "veniremember involved" to cure error. *Cortez*, 159 S.W.3d at 91. In other words, even if the McMillins had used their peremptory challenges exclusively against veniremembers they had challenged for cause, three of the veniremembers at issue in this appeal would have remained on the jury list.[7] Lacking peremptory challenges to use against those veniremembers, the McMillins notified the district court that "because the Court refused to remove certain jurors for cause," they would have an insufficient number of peremptory challenges to strike the veniremembers they found objectionable, listed all six of the veniremembers at issue on appeal,[8] and requested additional peremptory strikes.

State Farm contends that the McMillins waived error because they did not identify the specific veniremembers previously challenged for cause against whom they were intending to use peremptory strikes. Only by specifically identifying those veniremembers, State Farm insists, could the McMillins enable the district court to determine that they were, in fact, being forced to

---

sometimes contradictory goals of obtaining a favorable verdict while protecting the record, and that "[s]o it is that the best advocates, who know how to preserve error, sometimes decide not to do it.").

[7] The McMillins used three peremptory challenges on veniremembers 15, 22, and 37, who they had challenged for cause at trial but do not challenge on appeal. At that juncture, the McMillins had remaining only three peremptory challenges to use in curing any error regarding the six veniremembers they now challenge on appeal.

[8] As *Cortez* indicates, "objectionable" jurors remaining after peremptory strikes are exhausted may include both those previously challenged for cause and those desired to be stricken for other reasons. *Id.* at 91 (explaining that party need not explain why it found each identified veniremember objectionable).

accept objectionable jurors. *See Hallett*, 689 S.W.2d at 890. We disagree. Under these circumstances, where the McMillins reminded the court that they had challenged thirteen veniremembers for cause and that the six peremptory challenges were insufficient to strike all of them, the McMillins adequately apprised the court that its denials of the challenges for cause were forcing the McMillins to accept objectionable jurors.[9]

We also reject State Farm's argument that the McMillins waived error by using peremptory strikes against veniremembers 15, 22, and 37 rather than on earlier-reached jurors they had also challenged for cause, 1, 5, 12 and 14. We find no authority that would have required the McMillins to use their peremptory strikes against veniremembers challenged for cause in any particular order to preserve error.

The net effect of our holdings is that the McMillins must demonstrate that the district court abused its discretion in overruling their for-cause challenges to at least four veniremembers —one panelist more than the three for which error was waived—in order to show harm.[10] Conversely, we must affirm the district court's rulings if it did *not* abuse its discretion in denying the McMillins' for-cause challenges regarding at least three veniremembers.

---

[9] We also disagree with State Farm's depiction that the McMillins' counsel "merely listed the juror numbers of thirteen venire members they had already unsuccessfully challenged for cause, and then challenged them again."

[10] On the record before us, we cannot correlate the McMillins' waivers of three challenges for cause to any three specific veniremembers.

*Merits*

Veniremembers may be disqualified for cause from serving on a petit jury for several reasons. *See* Tex. Gov't Code Ann. § 62.105 (West 2005). They may be disqualified if they are directly or indirectly interested in the outcome of the suit. *See id*. § 62.105(2). They may also be disqualified if they are prejudiced or biased for or against one of the parties. *See id*. § 62.105(4); *see Goode v. Shoukfeh*, 943 S.W.2d 441, 452-53 (Tex. 1997). Prejudice "means prejudgment, and consequently embraces bias." *Compton v. Henrie*, 364 S.W.2d 179, 182 (Tex. 1963). Bias is "an inclination toward one side of the issue rather than the other." *Goode*, 943 S.W.2d at 453. But to cause disqualification, the juror's biased state of mind must lead to the natural inference that the juror will not or did not act with impartiality. *Id*. (citing *Compton*, 364 S.W.2d at 182).

In *Cortez*, the Texas Supreme Court emphasized that a veniremember who has made statements indicating possible bias may be rehabilitated.[11] *Cortez*, 159 S.W.3d at 91-92. A veniremember's statement that the plaintiff starts off "slightly behind" is not alone grounds for reversing a trial court's refusal to disqualify that member. *See Cortez*, 159 S.W.3d at 94; *Goode*, 943 S.W.2d at 452 n.4, 453. Instead, the court may permit further questioning that clarifies the veniremember's position. *Cortez*, 159 S.W.3d at 93. As the supreme court explained, the relevant inquiry is "not where jurors *start* but where they are likely to *end*. An initial 'leaning' is not disqualifying if it represents skepticism rather than an unshakeable conviction." *Id*. at 94.

---

[11] In the wake of *Cortez*, 159 S.W.3d at 91-94, the McMillins have abandoned their original complaint that the trial court erred by accepting rehabilitation testimony.

11

We review the failure to strike jurors for cause for an abuse of discretion. *Cortez*, 159 S.W.3d at 93. We find error only where there is an abuse of discretion, recognizing that trial judges are in a better position to evaluate the veniremembers' sincerity in their responses and capacity for fairness and impartiality. *Id.* (citing *Swap Shop v. Fortune*, 365 S.W.2d 151, 154 (Tex. 1963)). We must consider the entire examination. *Cortez*, 159 S.W.3d at 93.

Applying these standards, we conclude that the district court did not abuse its discretion with respect to at least three of the veniremembers challenged on appeal.[12] Veniremember No. 1, Linda Roberts, asserted that the crisis over mold in homes was "very much overstated" and she expressed concern that the lawsuits had raised her home-insurance premiums and would prevent her from obtaining new home insurance. Of the latter, she said, "I think it could bias me." She also said, "[I]t would be very difficult for you to prove to me that a house that's worth $500,000, that they should get $5 million." She told the McMillins that they would be "starting behind" with her as a juror and that she was not the best juror for the McMillins' case. Roberts asserted, however, that she would listen to the facts and would award the McMillins $5 million if the evidence supported the award, including damages for mental anguish. She said that the fact that the case involved mold would not affect her ability to determine and award damages for the repair and replacement costs of the house.

---

[12] To assess the court's exercise of discretion, we have reviewed statements made at jury selection. The following summaries come from both the general section of the voir dire examination during which questions were posed to and answered by the entire venire, and the colloquies with individual veniremembers that were conducted thereafter.

No. 12, Jennifer Emmons initially agreed with the McMillins' characterization of her attitude toward their complaints that she "couldn't award [$5 million], no way, not ever, no how, under any circumstances." She also said that she had a problem awarding mental anguish damages and punitive damages if the repair costs were covered. She agreed that the McMillins would have to bring more than fifty-one percent proof to convince her they were entitled to mental anguish damages and proof almost beyond all doubt to earn punitive damages. Under examination by State Farm, Emmons reiterated that awarding mental anguish damages was against her nature, but said that she would follow the judge's instructions and would apply the evidentiary standards for proof of mental anguish and punitive damages.

No. 29, Arthur Flores first said that he could not award the full amount of damages requested no matter what because "[t]hat's too much." He later said he could award the damages if proven.

Under the applicable legal standards as clarified by *Cortez*, and giving due deference to the district court's front-line assessment of credibility and demeanor, we find no abuse of discretion in the district court's refusal to strike these jurors for cause. Although some of these jurors said in various ways that the McMillins "started out behind" because of the nature of their claims and the amount they claimed, when questioned further they said that they would listen to the evidence and apply the relevant standards of proof; this is the type of rehabilitation approved by *Cortez*. *See* 159 S.W.3d at 93-94. The jurors' statements that the $5 million demand far exceeded the estimated $500,000 value of the house was a statement of fact, not evidence of bias.

Because we have concluded that the district court did not abuse its discretion in overruling the McMillins' for-cause challenges to these three veniremembers, the McMillins could not, in light of our preservation holding, demonstrate harm from any error in the district court's rulings on their other three for-cause challenges. We thus express no opinion regarding whether the district court abused its discretion with respect to the McMillins' challenges to No. 14, Arnulfo Guajardo, and No. 16, Kevin Johnson, both of whom were State Farm policyholders,[13] or No. 5, Samuel Stone, Jr.[14] We overrule the McMillins' primary issue.

**Request for spoliation instruction**

The McMillins next contend that the district court abused its discretion in failing to give a spoliation instruction based on State Farm's failure to produce a witness for deposition in Austin, as had been ordered by the district court. The McMillins encountered considerable frustration in their attempts to obtain discovery regarding State Farm's internal Operations Guidelines governing the carrier's handling of mold claims. Although the McMillins had requested the operations guidelines in discovery, State Farm did not produce the documents or acknowledge their existence until after the discovery period had closed. The McMillins sought relief from the district court, which ordered State Farm to produce for deposition a corporate representative most

---

[13] Johnson, moreover, had been offered legal services by State Farm in connection with a wreck involving his son.

[14] Stone also said he thought he had State Farm insurance, but that policy would not affect his deliberations. The McMillins waived this ground by not asserting it to the trial court. *See* Tex. R. App. P. 33.1(a).

knowledgeable about the guidelines.[15]  State Farm responded by producing a manager, Jeff Grabill, who admitted during his deposition that he actually knew little about the mold guidelines.  The McMillins again sought relief from the district court, which agreed that State Farm had violated the prior order by failing to produce the person most knowledgeable about the guidelines.  Following consultation with the parties, the court ordered State Farm to produce in Austin for deposition Floyd Leffew, who was represented to be the guidelines' author.  But State Farm subsequently refused to produce Leffew in Austin on the basis that he was soon retiring from State Farm and that, prior to that time, his wife was having surgery, requiring him to remain with her in Illinois.  Leffew also claimed to have developed a sinus infection that precluded his traveling to Austin by either air or car.  State Farm did, however, offer the McMillins the opportunity to depose Leffew by videoconference or in person at Leffew's Illinois home, and offered to pay the expenses of the McMillins' counsel.  With trial looming in less than five days, the McMillins declined.

The McMillins again sought relief from the district court, requesting monetary sanctions of $1000 as reasonable and necessary attorney's fees, a spoliation instruction to the jury regarding State Farm's failure to produce Leffew, and exclusion of any evidence from State Farm seeking to explain its failure to produce Leffew.  The proposed instruction stated:

> You are instructed that State Farm employee Floyd Leffew was a principal author of Policy Guideline O.G. 75-110 entitled *Mold Mildew and Other Fungi*.  Mr. Floyd Leffew has testified in another case that he is the principal author for O.G. 75-110.

---

[15]  State Farm subsequently disputed whether the court's order compelled it to produce a representative *most* knowledgeable regarding the guidelines, contending that it was merely required to produce *a* representative with *some* knowledge of the guidelines.  The district court rejected State Farm's interpretation of the order.

He has also testified that he sits on a committee that reviews, modifies, and updates other policy guidelines that potentially govern water claims involving mold.

The Defendant should have but failed to identify Mr. Leffew as a person with knowledge of facts relevant to this case.

The Defendant was ordered by the Court to produce Mr. Leffew for a deposition in Austin. The Defendant refused to comply with the Court's Order.

You may draw whatever inference you feel is reasonable from the Defendant's defiance of the Court's Order to produce Mr. Leffew in Austin for a deposition.

State Farm attempted to explain its failure to produce Leffew as ordered as an error by counsel who, at the previous hearing, had agreed to produce Leffew in Austin without first inquiring whether the witness was in fact available. Noting that it had ordered State Farm to produce Leffew in Austin, the district court awarded the McMillins the $1000 sanction they had requested. However, the court denied all other relief, stating that it believed the proposed instruction to be an improper comment on the evidence and that this ruling, as the McMillins acknowledge, mooted their request to exclude evidence.

Sanctions are appropriate for spoliation of evidence when there was a duty to preserve evidence, the alleged spoliator negligently or intentionally spoliated the evidence, and the spoliation prejudiced the nonspoliator's ability to present its case or defense. *Offshore Pipelines, Inc. v. Schooley*, 984 S.W.2d 654, 666 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (citing *Trevino v. Ortega*, 969 S.W.2d 950, 954-55 (Tex. 1998) (Baker, J. concurring)). A jury instruction regarding spoliation is proper when a party has deliberately destroyed evidence or has failed to either produce relevant evidence or explain its nonproduction. *Wal-Mart v. Johnson*, 106 S.W.3d 718, 721-22 (Tex. 2003). A spoliation instruction tells the jury that, if a party has control over a piece of evidence and

16

fails to retain or produce it, the jury should presume that the evidence would have been unfavorable to the party who controlled the evidence. *Id*. at 720-21.

The McMillins complain that State Farm's failure to produce Leffew left them without meaningful discovery regarding the carrier's interpretation of its mold operational guidelines. For instance, the McMillins construed a guideline stating that status letters should be sent to the insured at regular intervals (usually every 30 days) as a mandatory requirement because it appeared in a section of the guidelines labeled as "requirements." At trial, State Farm's witness opined that, by contrast, frequent oral contact with the client could substitute for sending a regular form letter, although the guidelines did not expressly permit that substitution. The McMillins complain that State Farm's conduct deprived them of the opportunity to discover State Farm representatives who, in the McMillins' words, "might have" interpreted the operational guidelines in their favor. The McMillins urge that this evidence was highly relevant to whether State Farm engaged in an unconscionable, unfair, or deceptive act or practice. They insist that the district court's failure to give the instruction was harmful because, having been deprived of discovery on the issue, they could not otherwise rebut State Farm's evidence concerning its interpretation of the guidelines.

"Discovery in civil cases is founded on the principle that justice is best served when litigants may obtain information not in their possession to prosecute and defend claims." Explanatory Statement Accompanying the 1999 Amendments to the Rules of Civil Procedure Governing Discovery, Order of Approval of the Revisions to the Texas Rules of Civil Procedure,

17

Misc. Docket No. 98-9196, (Tex. Nov. 9, 1998).[16]  Abuse of the discovery process through unwarranted delays and unresponsiveness accordingly subverts justice, and we condemn any such conduct.  At the same time, however, we recognize that trial judges are in the best position to evaluate the often complex facts and equities of discovery disputes and determine whether discovery abuse has in fact occurred, the relative culpability and harm of such conduct, and the credibility of a party's attempts to explain delays and unresponsiveness.  We accordingly review a trial court's determinations whether to award discovery sanction under an abuse of discretion standard.  *Reiff v. Roy*, 115 S.W.3d 700, 707 (Tex. App.—Dallas 2003, no pet.); *see also TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991).  We also apply the abuse of discretion standard in reviewing a trial court's decision to give or refuse a jury instruction.  *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 719 (Tex. 2003); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 224 (Tex. 2001).

Giving due deference to the district court's firsthand assessment of these facts, we cannot say that it abused its discretion in refusing to give the instruction the McMillins requested.  (We express no opinion as to whether the district court would have been within its discretion in imposing this or any other discovery sanctions, had it done so.)  The district court had before it the history of the litigation and the progression of events specific to the discovery dispute.  It heard the explanations and complaints of the parties, and struck a balance by granting a monetary sanction but, finding that the evidence was eventually presented or at least offered, declining to award the full

---

[16]  This explanatory note is available on the Texas Supreme Court's website at http://www.supreme.courts.state.tx.us/rules/tdr/fr111098.htm.

extent of sanctions and the instruction the McMillins requested. This is the essence of an exercise of discretion, and we find no abuse of that discretion.

**Breach of contract damages**

The district court submitted an issue on the McMillins' breach of contract theory, "Did State Farm fail to comply with the terms of the policy between it and Plaintiffs . . . .?" The jury responded, "Yes." Predicated upon its liability submission, the court also submitted the following damages issue, with the jury's responses so indicated:

> What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiffs for their damages, if any, that resulted from such failure to comply?
>
> * * *
>
> The amount that should have been paid minus the amount actually paid under Coverage A Dwelling coverage under the Policy: $1,000
>
> The amount that should have been paid minus the amount actually paid under Loss of Use coverage under the Policy: $     0
>
> The amount that should have been paid minus the amount actually paid for reasonable and necessary expenses incurred in attempting to prevent further damage to the home: $     0

State Farm contends that no evidence supports the award of $1000 in damages under Coverage A. It also attacks the underpinnings of that award, asserting that the district court erred in granting summary judgment that Coverage A encompassed mold damage and that, accordingly, it did not breach the policy because the amount it paid for repairs for water damage fully discharged its Coverage A obligations as a matter of law.

19

The McMillins contend that the evidence was legally and factually insufficient to support the jury's failure to award damages for additional living expenses under Loss of Use coverage or expenses incurred in attempting to prevent further damage. They assert that the evidence conclusively established their entitlement to $34,800 for additional living expenses under the loss of use coverage and to $990 for expenses incurred in attempting to prevent further damage.

### *Standard of review*

There is "no evidence" or legally insufficient evidence when (a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, No. 02-1012, 2005 Tex. LEXIS 436, at *11 (Tex. June 9, 2005) & *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (both citing Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex. L. Rev. 361, 362-63 (1960)). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Havner*, 953 S.W.2d at 711; *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994). If the evidence is so weak as to do no more than create a mere surmise or suspicion of its existence, its legal effect is that it is no evidence. *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 182 (Tex. 1995).

Parties attacking the legal sufficiency of an adverse finding on an issue on which they have the burden of proof must further demonstrate that the evidence conclusively established all vital

20

facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). We examine the record for evidence supporting the finding that reasonable jurors could believe, disregarding all contrary evidence that reasonable jurors could ignore. *City of Keller*, 2005 Tex. LEXIS 436, at *74. If the proposition contrary to the verdict is established as a matter of law, we must render judgment for that proposition. *Dow*, 46 S.W.3d at 241. If the evidence favoring a particular amount of damage award is not contradicted by any other witness or attendant circumstances, and the same is clear, direct and positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it can be taken as true—even if the evidence comes from an interested witness. *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990). This is especially true where the opposing party has the means and opportunity of disproving the testimony, if it is not true, and fails to do so. *Id*. An appellate court can render judgment based on such uncontradicted testimony. *Id*.; *see also Brown v. Bank of Galveston, N.A.*, 963 S.W.2d 511, 515 (Tex. 1998). However, if the uncontradicted evidence is unreasonable, incredible, or questionable, it only raises a question of fact, and a judgment based on that evidence is not required. *See Ragsdale*, 801 S.W.2d at 882.

When reviewing a challenge to the factual sufficiency of the evidence, we must consider, weigh, and examine all of the evidence in the record. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). If a party is attacking the factual sufficiency of an adverse finding on an issue to which the other party had the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding. *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex. App.—Austin 1992, no writ). We should set aside

21

the verdict only if the evidence that supports the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We may not reverse merely because we conclude that the evidence preponderates toward a different answer. *See Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988).

### Coverage A Dwelling coverage

State Farm attacks the jury's $1000 damage award for breach of its Coverage A obligations on two fronts. It argues that no evidence supports the $1000 award. State Farm also argues that the court erred by granting the McMillins' motion for summary judgment that the policy covered water damage that causes an ensuing loss by mold.

#### Damage award

State Farm contends that the McMillins produced no evidence of damages from sources other than mold in excess of the amount State Farm already paid. It contends that the only source of a $1000 figure in the record is Mr. McMillin's statement that he believed he was charged the $1000 deductible twice; State Farm contends that his statement is not evidence of a double-charge. The McMillins contend that ample evidence supports at least a $1000 award.

Juries have broad discretion in assessing damages where the law provides no precise legal measure; a jury's findings will not be disregarded merely because its reasoning in arriving at its figures may be unclear so long as a rational basis for its calculation exists. *Swank v. Sverdlin*, 121 S.W.3d 785, 799 (Tex. App.—Houston [1st Dist.) 2003, pet. denied); *First State Bank v. Keilman*, 851 S.W.2d 914, 930 (Tex. App.—Austin 1993, writ denied). However, damages cannot be based

on mere speculation and hypothesis. *See Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 49-50 (Tex. 1998). This limitation is expressed through a variety of legal requirements governing proof of damages.

Jury awards must be supported by evidence of the value of the property damaged or that must be replaced. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002). The jury in *Low* found that Gulf States wrongfully terminated the plaintiff's electric service and awarded, among other damages, $100 for spoiled food. *Id*. at 563. But, because the plaintiff had presented no evidence of the cost of the spoiled food, the supreme court held that he was not entitled even to nominal damages. *Id*. at 566-67. In certain circumstances, evidence that supports a particular damage amount may be factually insufficient to support even a jury award that is smaller than the evidence would support. *Keilman*, 851 S.W.2d at 930. In *Keilman*, which concerned whether a bank charged unauthorized interest, the parties presented competing calculations; the bank contended that it had charged $169.92 in authorized interest, and the plaintiff contended that the bank had charged $7161.44 in unauthorized interest. *Id*. The jury found that the bank had charged $360 in unauthorized interest. Although the $360 award was within the range between the competing interest figures, the evidence was factually insufficient to support the award because there was inadequate support for a theory that would have resulted in a $360 figure. The evidence supported a choice of one figure or the other, not a verdict somewhere in the range between them. *Id*.

On the other hand, where there is proof to support a range of damage options, the mere fact that nothing in the record shows how the jury arrived at a specific amount is not fatal to the verdict. *Mayberry v. Texas Dep't of Agric.*, 948 S.W.2d 312, 317 (Tex. App.—Austin 1997, writ

23

denied). In *Mayberry*, we concluded that some evidence supported a jury verdict for back pay because the theory of the case provided for a range of possible damage awards (rather than a binary choice between two amounts) depending on when the jury concluded the plaintiff should have been promoted, and because the verdict was within the narrow range defined by competing extremes posited by the parties. *See id*. (award of $1206 fell between $1028 and $1292).

The McMillins produced evidence of up to $242,382.95 in damages. Mr. McMillin testified that State Farm set the replacement value of the house at over $540,000,[17] and that the house was a total loss. The McMillins' public adjuster, Jim Beneke, estimated that repairs would cost $510,042.09; this total includes his estimate of $334,956.12 for building repairs and the mold remediators' estimate of $175,085.97. Beneke opined that there could be additional costs due to inflation and overruns.

But State Farm argues that there is no evidence to support the $1000 award because there is no rational basis for it. State Farm rejects Mr. McMillin's statement that he believed State Farm charged the $1000 deductible twice—unsupported by any documentation—arguing that it is at best speculation and no evidence that State Farm did so.[18] *See Keilman*, 851 S.W.2d at 930. Although the repair estimates provide a cumulative demand that could support a range of higher damage amounts, the McMillins point to no discrete item that supports a $1000 award. Nor do they

---

[17] McMillin testified that State Farm valued the house at $540,750 for replacement purposes. He testified that, "even with the house in the state it was" after the discovery of mold, State Farm raised the value to $561,000.

[18] When testifying about amounts he believed State Farm owed under the policy, McMillin testified that "although I know Mr. Nolan had done a figure on the—where the deductible, I still don't under—it still seems to me that he took a second deductible out of my—so I added in the $1000 deductible that they took out, the second deductible."

point to any basis on which the jury might have relied in drastically reducing the McMillins' estimated total repair costs.

We conclude, however, that we cannot say that the record contains no evidence to support a $1000 award. This is not like *Keilman* in which the jury had to choose between competing theories on how interest should be calculated. *Id*. Nor is it like *Low*, in which the plaintiff presented no evidence of the cost of his spoiled food. *See* 79 S.W.3d at 566. The repair estimates provided were not based on a mathematical formula; indeed, Beneke testified that actual costs could vary. Rather than a binary choice or a series of binary choices, this evidence presented the jury with a range of possible awards. That they chose a round figure near the low end of the range does not invalidate the award. *See City of Houston v. Harris County Outdoor Advertising Ass'n*, 879 S.W.2d 322, 334 (Tex. App.—Houston [14th Dist.] 1994, writ denied); *see also Neiman Marcus Group, Inc. v. Dworkin*, 919 F.2d 368, 374 (5th Cir. 1990); *Insurance Co. of North Am. v. Cangelosi*, 217 S.W.2d 888, 890 (Tex. Civ. App.—Waco 1949, no writ). Legally sufficient evidence supports the jury's finding. We overrule State Farm's first issue.

*Mold coverage*

State Farm contends that the award for breach-of-contract damages was erroneous because the district court erred by granting summary judgment that the policy provides mold coverage either directly or through an ensuing-loss provision. State Farm argues that the court should have granted its competing motion for a summary judgment declaring that the policy did not

25

cover mold. We need not explore the merits of this issue, however, because its resolution will not alter the judgment.

Even if the summary judgment is erroneous, State Farm would have to show that the error was harmful in order to merit reversal of the judgment. *See* Tex. R. App. P. 44.1(a). Any error in granting the summary judgment was harmful only if the jury's $1000 award for Coverage A Dwelling coverage included mold-related expenses. *Cf. Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000) (commingling valid and invalid theories is harmful even if evidence supports jury award solely on valid theory). But to complain of a damage award that improperly commingles valid and invalid theories of recovery, an appellant must object to the submission of a question to the jury that permits such commingling. *See id*. at 387-88. We find no objection to the submission of this question or to its subsuming of questions concerning mold-related expenses and non-mold-related expenses into a single question. Thus, State Farm cannot complain on appeal of harm by asserting that the award included mold-related expenses unless there was no evidence to support a finding of $1000 in non-mold-related expenses.

The record contains evidence of at least $1000 in covered, non-mold-related expenses remained unpaid. State Farm paid $346,875.62 on the McMillins' claim. One remediation contractor testified that at least $50,000-$60,000 of the amount State Farm paid was for mold containment; another contractor put that figure at $52,000. This provides some evidence that State Farm paid $296,875.62 to repair non-mold damage. Using Beneke's estimate that non-mold repairs would cost $334,956.12, there is some evidence that $38,080.50 in non-mold related damage claims

(the non-mold portion of Beneke's estimate less the non-mold amounts paid by State Farm) remained unpaid;[19] that exceeds the $1000 award.

Because State Farm failed to object to the submission of the damage question on grounds that it subsumed both covered expenses and non-covered expenses, and because the record contains evidence of sufficient covered unpaid non-mold-related expenses, it cannot show harm from the grant of the McMillins' motion for summary judgment that the policy also covered mold expenses. Because State Farm cannot show harm from the summary judgment, we decline to address whether the summary judgment was erroneous because resolution of this issue is not necessary to our disposition of this appeal. *See* Tex. R. App. P. 47.1. Sufficient evidence of unpaid, non-mold-related expenses supports the $1000 award. We overrule State Farm's second issue.

### *Additional living expenses*

The McMillins challenge the jury's finding that they were entitled to zero additional living expenses for their loss of the use of their home. The McMillins claim that they proved $34,800 in additional living expenses incurred in purchasing a second home on Woodmont Avenue; these expenses cover the period from the purchase in June 2001 until they became "settled" in February 2002. They request that the judgment be modified to include compensation for eight

---

[19] The fact that the remediation contractors' estimates of how much of State Farm's payments paid for mold-related costs were minimum estimates does not undercut this analysis; if the portion of State Farm's payments that went to mold-related costs was higher, then even more of the McMillins' non-mold-related claim remains unpaid. For example, if $100,000 of State Farm's payment went to mold-remediation costs, then only $248,875.62 of their non-mold claims were paid, leaving $88,080.50 unpaid.

27

months' worth of mortgage interest ($2750 per month), taxes ($1300 monthly), and insurance ($300 monthly).

State Farm defends the jury's findings, arguing that the policy does not cover costs associated with purchasing a new home and that the evidence supports a finding that this increase in the McMillins' living expenses was not necessary and reasonable. State Farm argues that, while expenses related to a rental property would be covered, mortgage, taxes, and insurance are not.

The construction of an unambiguous contract is a question of law for the court. *Buys v. Buys*, 924 S.W.2d 369, 372 (Tex. 1996). Whether a contract is ambiguous is a question of law for the court to decide by examining the contract as a whole in light of the circumstances present when the contract was entered. *Columbia Gas Transmission Corp. v. New Ulm Gas., Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). A contract is unambiguous if it can be given a definite or certain legal meaning. *Id.*; *see also Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). An ambiguity does not arise simply because the parties advance conflicting interpretations of the policy, particularly if one of the conflicting interpretations is unreasonable. *Lopez*, 22 S.W.3d at 861; *Columbia Gas*, 940 S.W.2d at 589. But if the insurance policy is subject to one or more reasonable interpretations, it is ambiguous. *National Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991).

The general rules of contract construction govern interpretation of an insurance policy. *Id.*; *Texas Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 879 (Tex. 1999). We assume the parties to a contract intended every clause to have some effect; we cannot strike down any portion of a contract absent irreconcilable conflict. *See Edlund v. Bounds*, 842 S.W.2d 719, 726 (Tex.

28

App.—Dallas 1992, writ denied). Although we give words their plain, common, or generally accepted meaning, we may resort to extrinsic sources to determine if a term has a generally understood meaning peculiar to the specialized industry. *Mescalero Energy, Inc. v. Underwriters Indem. Gen. Agency*, Inc., 56 S.W.3d 313, 320 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). When ambiguous insurance policy terms permit more than one interpretation, we construe the policy against the insurer. *State Farm Fire & Cas. Co. v. Vaughan*, 968 S.W.2d 931, 933 (Tex. 1998). This is so especially when the policy terms exclude or limit coverage. *National Union*, 811 S.W.2d at 555.

The McMillins' policy does not set out explicitly what additional living expenses it covers. The policy provides as follows:

> additional living expense, meaning any necessary and reasonable increase in living expense you incur so that your household can maintain its normal standard of living. . . . Payment will be for the reasonable time required to repair or replace the damaged property. If you permanently relocate, payment will be for the reasonable time required for your household to become settled.

The McMillins argue that the meaning of "become settled" is a question of contract interpretation for the court. They advocate using the definition "begin to feel comfortable or established in a new home," citing The New Oxford American Dictionary 1560 (2001).

Even accepting the McMillins' definition, the policy covers only reasonable and necessary expenses incurred during the reasonable time for the insured to become settled. Whether conduct is reasonable is ordinarily a question of fact. *Adam Dante Corp. v. Sharpe*, 483 S.W.2d 452, 456 (Tex. 1972). The question of reasonableness is one peculiarly tailored to the province of the

29

jury. *Tri-State Wholesale Assoc. Grocers, Inc. v. Barrera*, 917 S.W.2d 391, 397 (Tex. App.—El Paso 1996, writ dism'd by agr.); *see also Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 55 (Tex. 1997). Here, the coverage decision depends on the reasonableness of the insured's conduct in incurring expenses and becoming settled. Accordingly, we must examine the record for evidence supporting the jury's finding that the McMillins proved no reasonable additional living expenses.

The parties disagreed strongly over the length of the reasonable period to become settled. Although the McMillins hoped for several months to repair the Murray house, they abandoned that hope and bought the Woodmont house intending to permanently relocate there. But they contend that they did not become settled in the Woodmont house for eight months after purchasing it and moving in. They contend that, during this adjustment period, their mortgage interest, insurance, and taxes for those months were reasonable and necessary expenses above their normal living costs that were incurred because of their property loss. By contrast, State Farm claim adjuster Lisa Webb testified that, generally, "settled" means "moved in." Tom Veitch, an attorney with experience in the insurance field, testified that becoming settled under the policy takes about two days after moving in, during which time the policy would cover expenses such as restaurant expenses and utility connection fees; the McMillins do not seek to recover these type of expenses.

This record supports the jury's finding that the McMillins did not prove themselves entitled to recover their mortgage interest, insurance, and tax expenses as additional living expenses under the policy's loss-of-use provision. The jury was entitled to determine that the "reasonable time" during which the policy provided such coverage was two days or less. The record also supports a factual determination that the expenses associated with the purchase of the Woodmont

30

house for permanent relocation were not increases in living expenses during those two days or less, but were expenses dedicated to the acquisition, protection, and retention of an asset for the long-term. The record legally and factually supports the zero damages finding on this issue.

### *Expenses to prevent further damage*

The McMillins challenge the jury's finding that they were entitled to zero reasonable and necessary expenses incurred seeking to prevent further damage to the home. McMillin testified that he submitted a claim for $990.13 for covering the roof with a tarp, but had not received a check for that amount. State Farm claim adjuster Lisa Webb agreed that the McMillins had submitted a receipt for and were entitled to $990.13 for such expenses; she testified that she had issued a check for that amount and that the check had not been cashed. Webb also testified that the McMillins held onto their $344,367.27 repair check from when it was issued August 7, 2001 until they cashed it in June 2002. The court asked the jury for "[t]he amount that should have been paid *minus the amount actually paid* for reasonable and necessary expenses incurred in attempting to prevent further damage to the home." (Emphasis added.) The jury found that State Farm owed nothing.

We conclude that no evidence supports the take-nothing finding. State Farm agreed that the homeowners incurred $990.13 for the tarp expenses and that the expenses were covered by the policy; thus, $990.13 is an "amount that should have been paid." The jury's zero finding is supported only if that amount is fully offset by "the amount actually paid." Accepting Webb's testimony that State Farm sent the check, there is still no evidence that the homeowners have been "actually paid" $990.13 because there is no evidence that they received the check. State Farm would be entitled to a rebuttable presumption that the McMillins received the mailed check if it had

31

introduced evidence that the letter was properly addressed, stamped, and mailed. *Southland Life Ins. v. Greenwade*, 159 S.W.2d 854, 857 (Tex. 1942). Webb's testimony on the mailing issue was as follows:

> Q. And did you put a check in the mail for $990.13?
>
> A. Yes.

There is no evidence that the letter had the proper address or postage; therefore, State Farm is not entitled to any presumption that the McMillins received the check. Further, there is no evidence that the money owed has been transferred from State Farm to the homeowners. State Farm argues that the jury could infer from the homeowners' previous 10-month retention of the $344,367.27 check that the homeowners are similarly retaining the $990.13 check. But that requires piling an inference that the homeowners received the check upon an inference that they chose not to cash it. "[A] vital fact may not be established by piling inference upon inference . . . ." *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968) (cited by *Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56, 79 (Tex. App.—Houston [14th Dist.] 2004, no pet.). This double inference is too tenuous to show payment of the amounts due in the absence of any evidence or presumption that the homeowners received the check. No evidence supports the jury's finding that State Farm did not, at time of trial, owe the homeowners for expenses incurred attempting to prevent further damage to the home.

Instead, conclusive evidence shows that State Farm owes the homeowners $990.13 for such expenses. Undisputed evidence contrary to a verdict may be conclusive when a party admits

it is true. *City of Keller*, 2005 Tex. LEXIS 436, at *28. State Farm admitted that it owed the

McMillins $990.13, that it mailed them a check for that amount, and that the check was not cashed.

The only evidence is that the McMillins did not receive the check. There is no evidence that any part

of the $990.13 has been in any other way transferred from State Farm to the McMillins. "When

evidence contrary to a verdict is conclusive, it cannot be disregarded." *Id*. at *33. The

uncontroverted evidence established as a matter of law that State Farm's admitted debt of $990.13

for expenses incurred to prevent future damage remains unpaid. Accordingly, we will render

judgment for the McMillins in that amount. *See Ragsdale*, 801 S.W.2d at 882; *see also Brown*, 963

S.W.2d at 515.

**Interest penalties under Article 21.55**

The parties present cross-issues relating to the assessment of an interest penalty of

$425.59 on the $1000 damage award[20] under the insurance code's provisions intended to promote

prompt payment of claims. Tex. Ins. Code Ann. art. 21.55 (West Supp. 2004-05). State Farm argues

that the McMillins' failure to make a claim in writing makes the interest penalty of article 21.55

---

[20] We will not consider whether 21.55 penalties are available for the other damage awards.

Although we will render judgment that the McMillins are entitled to $990.13 for expenses incurred to prevent further damage, the date by which State Farm received all documents relating to the Coverage A claim is not relevant to the $990.13 recovery; the jury was not asked to find the date by which State Farm received all documents relating to their claim for damage-prevention expenses, and the McMillins do not complain about the absence of such a question or finding. The jury was asked about the date by which State Farm received all documents necessary to resolution of the loss-of-use claim, but found "no date." That is not challenged on appeal.

Our affirmance of the zero damages finding concerning additional living expenses also moots reconsideration of the zero interest award on that element of damages.

unavailable to them. The McMillins argue that the evidence conclusively supports a different answer to the question concerning the date by which that State Farm received all necessary and documentation relating to its Coverage A claim (the $1000 award), thus triggering an earlier accrual of an interest penalty.

The claim-handling periods of article 21.55 are triggered by the insurance company's "receipt of notice of claim." *Id*. § 2(a). The code defines a "notice of claim" as "any notification in writing to an insurer, by a claimant, that reasonably apprises the insurer of the facts relating to the claim." *Id*. § 1(5). State Farm argues that the McMillins' telephonic report of their damages did not satisfy the statutory requirement for written notice. *See Mid-Century Ins. Co. v. Barclay*, 880 S.W.2d 807, 810 n.3 (Tex. App.—Austin 1994, writ denied). State Farm argues that, because the report therefore did not trigger State Farm's statutory obligation to resolve the complaint within the statutory periods, State Farm cannot be penalized for failing to do so.

The McMillins respond that such a construction unfairly diminishes the protections to insureds. They note that article 21.55 "shall be liberally construed to promote its underlying purpose which is to obtain prompt payment of claims made pursuant to policies of insurance." *Id*. § 8. They argue that their telephonic report satisfied the purpose of the statute by reasonably apprising State Farm of the basis of their claim, and that State Farm never told them that their oral report of their problems constituted a waiver of statutory protections. To the extent that a writing is required, they argue that State Farm's telephone logs memorializing their telephonic notice suffice.

This issue turns on the meaning of the terms in the "notice of claim" provision. The primary rule of statutory construction is to ascertain and give effect to the legislature's intent. *See*

34

Tex. Gov't Code Ann. §§ 311.011, 311.021, 311.023 & 312.005 (West 2005); *Kroger Co. v. Keng*, 23 S.W.3d 347, 349 (Tex. 2000). We ascertain the legislature's intent in the plain and common meaning of the words used. Tex. Gov't Code Ann. § 311.011; *Keng*, 23 S.W.3d at 349. We must presume that every word of the legislation has meaning. *See Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 169 (Tex. 2004); *see also* Tex. Gov't Code Ann. § 311.021(2).

The McMillins' arguments require either ignoring the plain language and meaning of the statute or grafting meaning onto the statute. The statute requires compliance with its provisions to trigger the insurance penalties. *See generally* Tex. Ins. Code Ann. art. 21.55. It does not require the insurer to inform the insured of the necessity of a writing to trigger statutory penalties, nor does it contain a provision permitting actual notice to satisfy its provisions. Section 21.55 requires a notification in writing of a claim "to" an insurer that is "by" a claimant. *See id*. § 1(5). One of our sister courts has held that a claim form completed and signed by an insured together with her insurance agent can satisfy the notice requirement. *See Protective Life Ins. Co. v. Russell*, 119 S.W.3d 274, 288 (Tex. App.—Tyler 2003, pet. denied). In *Russell*, the claimant participated in the preparation of a written claim and signed it. By contrast, the McMillins do not claim they sent written notice to State Farm of their claim; instead, they rely on State Farm's printed telephone logs. Even reading the notice requirement broadly, we conclude that State Farm's internal telephone logs are not a notice of claim under the statute. Although State Farm's logs are in writing and memorialize a notification by the claimant, they are written by the insurer instead of being written by the claimant to the insurer as required, and they are not sent by the claimant to the insurer.

35

Because there is no evidence that the McMillins triggered the provisions of article 21.55 by providing notice in writing to State Farm of their claim, we sustain State Farm's third issue. Accordingly, the McMillins' complaint about the jury's finding of a date that fixed when the article 21.55 interest penalties began to accrue is moot because no penalties will accrue.

**Attorney's fees**

Challenging the jury's award of zero attorney's fees, the McMillins contend that they are entitled to attorney's fees based on the judgment that State Farm breached its contract with the McMillins. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (West 1997). They contend that the evidence proved as a matter of law they were entitled to a reasonable attorney's fees of $300,000 for the trial, $35,000 for this appeal, and $25,000 for any appeal to the supreme court.

State Farm defends the award of zero attorney's fees, contending that the McMillins are not entitled to attorney's fees for several legal, equitable, and factual reasons. State Farm contends that the McMillins made an excessive presuit demand, that they did not prevail as required to recover attorney's fees under the insurance code, that their insurance-related claims do not entitle them to fees under the civil practice and remedies code, and that their claim for $300,000 in attorney's fees based on a $1000 recovery is unreasonable.

The McMillins' claims are not barred by their presuit demand for $950,000 in repairs and attorney's fees. If the claimant made an excessive presuit demand and would not take a lesser amount, the claimant is not entitled to attorney's fees expended in litigation thereafter; we note that the doctrine does not bar recovery of attorney's fees expended before the excessive demand. *Findlay v. Cave*, 611 S.W.2d 57, 58 (Tex. 1981); *Lairsen v. Slutsky*, 80 S.W.3d 121, 131 (Tex. App.—Austin

36

2002, pet. denied). Excessive demand is an affirmative defense to an award of attorney's fees and must be pleaded or tried by consent. *Kurtz v. Kurtz*, 158 S.W.3d 12, 21 (Tex. App.—Houston [14th Dist.] 2004, pet. filed). State Farm notes that it was denied a jury question on the reasonableness of the presuit demand, but does not raise that as an issue on appeal. Instead, it points to the judgment as showing that the demand was unreasonable. But the size of the verdict does not prove that the McMillins would not have taken a lesser amount to settle the dispute, nor does it prove as a matter of law that the McMillins' demand was unreasonable. *See Findlay*, 611 S.W.2d at 58.

State Farm correctly argues that the McMillins are not entitled to attorney's fees under the insurance code. They did not prevail at trial on their article 21.21 claims of false, misleading, deceptive or unconscionable actions or practices. *See* Tex. Ins. Code Ann. art. 21.21 (West Supp. 2004-05). We have just determined that they are not entitled to recover interest penalties under article 21.55.

But they did prevail in their breach-of-contract claim and are entitled to an award of reasonable attorney's fees established by the evidence. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8); *Recognition Communications, Inc. v. American Auto. Ass'n, Inc.*, 154 S.W.3d 878, 891 (Tex. App.—Dallas 2005, pet. filed) ("*RCI*"); *World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 683 (Tex. App.—Fort Worth 1998, pet. denied). The fact that a plaintiff makes a claim on an insurance policy does not automatically bar recovery of attorney's fees under section 38.001; instead, "in a policyholder's successful suit for breach of contract against an insurer that is subject to the provisions listed in section 38.006, the insurer is liable for reasonable attorney's fees incurred in pursuing the breach-of-contract action under section 38.001 unless the insurer is liable for attorney's

fees under another statutory scheme." *Grapevine Excavation, Inc. v. Maryland Lloyds*, 35 S.W.3d 1, 5 (Tex. 2000). The McMillins are eligible to be awarded attorney's fees for prevailing on their breach-of-contract claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001.

Under some circumstances, an award of zero attorney's fees to the prevailing party is proper. A zero award is proper if the evidence (1) failed to prove (a) that any attorney's services were provided, or (b) the value of the services provided; or (2) affirmatively showed that no attorney's services were needed or that any services provided were of no value. *RCI*, 154 S.W.3d at 891; *Cale's Clean Scene Carwash, Inc. v. Hubbard*, 76 S.W.3d 784, 787 n.4 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

However, a jury cannot simply refuse to award attorney's fees if any were properly proven. *RCI*, 154 S.W.3d at 891; *Hubbard*, 76 S.W.3d at 787. Uncontroverted testimony by an interested witness may establish a right to attorney's fees as a matter of law. *RCI*, 154 S.W.3d at 891; *see Hubbard*, 76 S.W.3d at 787. Testimony by an interested witness establishes a fact as a matter of law if: (1) the testimony could be readily contradicted if untrue; (2) it is clear, direct, and positive; and (3) there are no circumstances tending to discredit or impeach it. *Lofton v. Texas Brine Corp.*, 777 S.W.2d 384, 386 (Tex. 1989). Where trial counsel's testimony concerning attorney's fees is clear, positive and direct, and uncontroverted, it is taken as true as a matter of law, especially true when the opposing party had the means and opportunity to disprove the testimony and failed to do so. *See Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 38.003 (West 1997) (rebuttable presumption that usual and customary attorney's fees are reasonable); *World Help*, 977 S.W.2d at 684. In such instances,

appellate courts will reverse a denial or minimization of attorney's fees and render judgment for attorney's fees in the amount proved. *See Ragsdale*, 801 S.W.2d at 882 (on injunction and $1 damage case, reversing $150 award attorney's fees award and rendering $22,500 judgment for attorney's fees); *RCI*, 154 S.W.3d at 891 (on $10,000 damage award, reversing jury's zero damage award and rendering $75,764 award); *see also Hubbard*, 76 S.W.3d at 786-88 (on $31,846 damage award affirming trial court's award of $29,225 in attorney's fees notwithstanding jury's zero award).

There was competing evidence regarding the amount of fees that would be reasonable and necessary in pursuing the McMillins' suit. The McMillins introduced evidence from their attorney, Jack Maroney, about the attorney's fees and costs he considered reasonable and necessary. He discussed taking more than thirty depositions, attending more than twenty pretrial hearings, sending more than 350 pieces of correspondence, and reading many pieces of correspondence in return. He stated that they had billed $557,000 in fees and expended $50,000 in court costs. He estimated $35,000 would be expended in attorney's fees for this appeal and an additional $25,000 for proceedings at the supreme court. State Farm's expert witness, Mike McKetta, testified that this case could and reasonably should have been handled through trial for $150,000, though the fee could reasonably be as much as double that; he said that he would consider any amount over $300,000 to be "outside of any range of reasonableness." He testified that the greater the amount in controversy, the greater the expenditure might be reasonable; if a dispute were over $20,000, he would not usually find reasonable an expenditure of 5, 10, or 20 times more than that to recover that amount.

No evidence supports the jury's award of zero attorney's fees for preparation and trial of this case. The only evidence is that at least $150,000—and perhaps as much as $300,000—was

reasonable and necessary for preparation and trial of the entire case. There was no dispute regarding the appellate fees. Because we find the evidence legally insufficient to support the zero attorney's fees award, we need not consider the factual sufficiency of the evidence. *See Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *Exxon Corp. v. Breezevale Ltd.*, 82 S.W.3d 429, 438 (Tex. App.—Dallas 2002, pet. denied). Thus, we will reverse the award of no attorney's fees.

But the record does not conclusively prove any particular amount that was a reasonable and necessary amount of attorney's fees. For example, the McMillins contend that the experts' testimony shows them entitled to $300,000 in attorney's fees, but McKetta's testimony was that up to $300,000 *could be* reasonable; that is far from conclusive. Nor is the evidence clear that they are entitled to the full $150,000 that McKetta testified he believed was reasonable; although the McMillins prevailed on some causes of action, they did not prevail on every claim and did not show as a matter of law that the entire amount was reasonable and necessary to recover on the claims on which they did prevail. Therefore, we will not render judgment in their favor, but will remand the issue of attorney's fees on the Coverage A Dwelling coverage claim for further proceedings.

We will also remand for a determination of what attorney's fees are reasonable and necessary with respect to the damage-prevention expenses—a theory on which the jury did not award damages and on which it therefore did not consider awarding attorney's fees. *See Pelto Oil Corp. v. CSX Oil & Gas Corp.*, 804 S.W.2d 583, 588 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (remanding only issue of attorney's fees after rendering judgment on appeal); *cf. Coffel v. Stryker Corp.*, 284 F.3d 625, 641 (5th Cir. 2002) (reversing for consideration of additional attorney's fees based on additional recovery under revised judgment). We cannot render judgment for these

attorney's fees because the evidence is not conclusive as to what part of the overall claim for attorney's fees is attributable to this claim or what fee is reasonable and necessary to prepare and try this claim. *See Ragsdale*, 801 S.W.2d at 882.

## CONCLUSION

We reverse the award of interest penalties under insurance code article 21.55 and render judgment that the McMillins take nothing by that claim. We reverse the judgment that the McMillins take nothing by their claim for expenses incurred to prevent further damage to the property, and render judgment that they take $990.13 on that claim. We reverse the award of zero attorney's fees and remand for consideration of what amount of attorney's fees, if any, the McMillins are entitled to for preparation and trial and appeal of the claims which entitle them to attorney's fees. We otherwise affirm the judgment.

_____

Bob Pemberton, Justice

Before Justices B. A. Smith, Puryear and Pemberton

Affirmed in Part; Reversed and Rendered in Part; Reversed and Remanded in Part

Filed:   August 26, 2005