# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00408-CV

**George Dix and Dahlia Gutierrez, Appellants**

**v.**

**Jon H. Brooks, d/b/a Brooks Custom Homes, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. GN300703, HONORABLE DARLENE BYNRE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This appeal arises from a dispute between a custom home builder, appellee Jon H. Brooks, and a married couple, appellants George Dix and Dahlia Gutierrez. Appellants contracted to purchase a lot from Brooks and have Brooks construct a new home there; they also had Brooks perform remodeling and repair work to prepare their existing home for sale. Disagreements arose concerning both sets of transactions, appellants terminated the new home construction contract, and the parties sued each other for damages. A jury found in favor of Brooks on each of his claims, against appellants on each of their claims and affirmative defenses, and awarded Brooks actual damages of $42,000 relating to the new home construction plus $6,500 for his work on the existing home. The district court rendered judgment on this verdict, also awarding $50,000 in stipulated attorney's fees through trial and a total of $15,000 in appellate attorney's fees.

Appellants challenge the portions of the judgment relating to the new home construction and the appellate attorney's fees award. We will affirm.

## BACKGROUND

**The construction contract and loan agreement**

In 2001, while shopping for a new home, appellants became interested in purchasing a lot at 9221 Simmons Road in Austin and building a new home there. Appellants ascertained that Brooks owned the lot and contacted him. This led to discussions concerning appellants purchasing the lot and having Brooks build a new home there. Appellants paid Brooks to draw up plans for the new home, meeting with Brooks several times during that process at their existing home at 7500 Stepdown Cove. Eventually, on January 26, 2002, the parties executed a "Residential Construction Contract," whose key provisions included the following:

- Brooks agreed to build a new home on the lot on 9221 Simmons Road in accordance with the Plans and Specifications prepared by Brooks.

- Appellants promised to pay Brooks a total of $525,823 ($125,000 for the lot and $400,823 for construction and related improvements), subject to agreed adjustments for change orders and other modifications as construction progressed.

- Brooks was permitted to obtain Progress Payments by making "draw requests for payment by Owner based upon the allocated cost of the completed portions and/or phases of construction performed to the date of each request."

- Upon presentation of a request for a Progress Payment, appellants had five business days to pay 90 percent of the amount allocated to the completed portion. However, if Brooks's work on a portion did not comply with the Plans and Specifications, appellants had the right to so notify Brooks and withhold all or a

2

portion of a Progress Payment as necessary to cover the cost of correcting such defect and until such correction was made.

- Appellants would obtain, prior to commencement of construction, an Interim Construction Loan to finance the project. The Progress Payments could be satisfied either wholly or partly through draws on the Interim Loan.

Appellants eventually obtained the Interim Loan from National City Mortgage Company (NCM). On April 5, 2002, NCM, appellants, and Brooks executed a Residential Construction Loan Agreement whereby NCM would loan a total of $509,750 to appellants ($400,823 for construction, the rest to go toward the lot). The Loan Agreement required NCM to advance loan proceeds "periodically, as construction of the Residence progresses, in the amounts and for the work described in the Construction Draw Schedule." The draw schedule listed various stages of construction and assigned to each stage percentages of the loan that Brooks could draw when he completed that stage.

To obtain an advance, the loan agreement required that "[a]t least five (5) business days prior to the date on which each advance is to be made, the Requisition and all other documents, instruments, and writing which may be required by Lender shall be delivered to Lender." Other documentation, however, indicated that NCM would fund draws ten days after the request was submitted; in the interim, NCM would send an inspector to verify that the claimed stage of construction had been completed.

On the same day they executed the Loan Agreement, the parties also executed an "Addendum to Residential Construction Loan Agreement" that provided, in relevant part:

3

2.  Inasmuch as Borrower has selected Contractor to construct the Residence based upon Contractors's skill and reputation, Borrower has elected to forego participation in the disbursement aspects of the Loan and Borrower has and does hereby appoint Contractor as Borrower's duly authorized agent for purposes of taking any and all actions (including, but not by way of limitation, submission of either written or verbal draw requests) necessary on Borrower's behalf to obtain disbursements or draws pursuant to the [Loan] Agreement. Borrower represents unto Lender, its successors, assigns, agents and counsel that each and all of them may rely on Contractor's authority to act in Borrower's stead as aforesaid. . . . Notwithstanding the foregoing, Borrower and Contractor understand and agree that Lender requires Borrower's signature, along with Contractor, on each advance check disbursed under the Loan.

3.  Contractor does hereby accept such appointment to act on behalf of Borrower as Borrower's duly authorized agent and represents unto Lender, its successors, assigns, agents and counsel that all actions taken in such regard shall be taken within the scope of the agency hereby created and upon which authority Lender may rely.

In addition to these requirements, the loan agreement established certain conditions precedent before NCM would issue the first and final draws. Before the first draw, both parties had to execute the loan agreement, security instrument and "[a] written draw request or requisition (the 'Requisition') in a form acceptable to Lender"; "[i]f requested by Lender, each such Requisition shall be accompanied by invoices, receipts, certificates and other documents," and a Disbursement Authorization. Appellants executed the Disbursement Authorization at closing. It provided, in relevant part, that "Lender shall advance all construction funds in accordance with this Disbursement Authorization upon Lender's receipt of verbal or written draw requests from either Borrower and/or Contractor" and that disbursements shall be in accordance with the Loan Agreement." It was undisputed that the agreements themselves did not require Brooks to submit subsequent draw requests other than the final one to appellants for prior approval.

4

**Brooks is hired to work on appellants' existing home**

During their discussions concerning the new home construction, appellants had also asked Brooks to perform some repair and remodeling work on their existing home to prepare it for sale. Before Brooks began this work, however, a pipe burst, water flooded a portion of the house, and eventually mold was discovered in that area. Appellants' insurer paid for mold remediation—the stripping of sheetrock, cabinetry, insulation, and other internal features, down to the studs, from floor level to four feet above—and agreed to pay to restore these portions of the home. Brooks performed this restoration work. In addition to this work, appellants asked Brooks to perform certain work for which they would pay him out-of-pocket.[1]

**Disputes arise**

As Brooks performed work on appellants' existing home and began construction of their new home, the parties' relationship deteriorated. Appellants questioned Brooks's workmanship on both projects and contended that he and his subcontractors were rude and unresponsive. Brooks disputed appellants' assertions about his workmanship[2] and sought to portray them as difficult customers who frequently and unreasonably complained to him or his subcontractors (or threatened

---

[1] This work included such things as installing new cabinets above the four-foot line, replacing toilets and valves, and installing new garage doors.

[2] For example, Brooks observed that Dix later met with George Pulliam, the project engineer, and that Pulliam reported that he was quite pleased with the work that had been performed on the new home.

them with legal action) and caused delays by changing their minds regarding the work they wanted done.[3]

It is undisputed that Brooks encountered delays both in getting appellants to pay his invoice for work on their existing home and in obtaining their approval for the first draw. In early August, Brooks had installed the plumbing "rough" running under and through the new home foundation and poured the foundation. On August 7 or 8, as required by the construction contract, Brooks submitted his first draw request to appellants for approval. Brooks requested a total of $52,348, equaling 14% of the construction contract amount, representing the plumbing rough (2%) and the foundation (12%). Appellants did not respond to this request within five days, as required under the construction contract. Gutierrez eventually signed the draw request on August 31, and Dix signed it on September 17.[4] NCM inspected the work to verify completion of the two stages and paid the first draw to Brooks on October 1. Appellants assert that they delayed paying the invoices

---

[3] Brooks placed most of the blame on Gutierrez, who described herself at the time as an "unemployed lawyer." Dix is a law professor.

The jury heard evidence of appellants' disputes with two other contractors who later worked on their new home, including considerable correspondence from Gutierrez complaining of various details of the contractors' work – and one letter which claimed that Dix had "decided that all of the delays in construction and the amount of time necessary to accomplish even the smallest task, such as selecting paint, are in fact **solely my fault**" (emphasis in original) and that "I am responsible for all of the construction problems . . . with all three builders."

[4] Shortly after obtaining both signatures, Brooks submitted the signed draw request to NCM. However, NCM refused to accept this request because Brooks had used his own form rather than that required by NCM. Brooks thus reentered the same figures on the NCM form, obtained appellants' signatures again, and finally resubmitted the request on September 24.

and approving the first draw because they had concerns about Brooks's workmanship, while Brooks attributed appellants' delays to the fact that the couple had "split up" at the time.[5]

**The garnishment action**

On October 28, 2002, appellants were served with a garnishment issued by David and Constance Yetter related to a lawsuit in which they had sued Brooks and other defendants over foundation problems in a nearby house Brooks had built. Appellants testified that this event alarmed them for several reasons. It revealed that another homeowner had sued Brooks for construction defects. Appellants also determined that the Yetters had taken an $800,000 default judgment against Brooks, raising doubts about his solvency and ability to complete work; they also determined that Brooks's pleadings had been stricken for his failing to attend court-ordered mediation. Finally, appellants claim that the existence of the Yetter litigation contradicted a representation that Brooks had made several months earlier. Appellants assert that while seeking financing, one potential lender rejected their loan application immediately after the lender learned that Brooks was to be their builder. The lender refused to elaborate on its concerns, which led appellants to infer that Brooks must have been in litigation involving the lender. Appellants contend that they then asked Brooks whether he was involved in any litigation, and that Brooks denied that he was.

---

[5] Appellants acknowledged that they were having marital problems at this time, and correspondence from Dix in response to Brooks's payment requests alludes to concerns with community property issues. Appellants attributed their difficulties to their concern about the construction projects and their being confined to a small apartment during the weeks and months while work was underway on their existing home.

Brooks denied that appellants ever inquired about or discussed with him impending litigation before they were served with the garnishment. He attributed the default judgment to a prior attorney who failed to keep him informed of events in that case. Brooks stresses that upon learning that appellants had been served with the garnishment, he immediately sought to assist them in getting the proceeding dismissed and agreed to pay their attorney's fees.[6] He also testified that he had considered but rejected filing for bankruptcy because "my subs would have been put at risk" and appellants "would have got right in the middle of that and they would have been encumbered. It would not have been a noble thing for me to do."

Ultimately, on December 10, Brooks agreed to settle the Yetter suit for $42,500;[7] his agreement to pay appellants' attorney's fees and release and indemnify them was also incorporated into the settlement agreement. Brooks ultimately paid appellants $2,700 with a cashier's check dated December 18. On December 23, Brooks paid the Yetters with a cashier's check, and the Yetters' suits were dismissed.

---

[6] In a November 12 letter, Brooks stated that, "It is my understanding that my attorney had given you some property code statutes that he feels should result in the dismissal of the suit, however I feel that it is not your responsibility to bear the expense of answering this lawsuit." Brooks further "apologize[d] for any inconvenience that this had caused you both, and it is my hope that . . . this will be dismissed as soon as possible."

[7] Brooks explained that he settled the suit rather than "[going] for the . . . overturn of the judgment" to remove the encumbrance from his ongoing business and customers and "put[] a finalization to it."

**The second draw**

Dix testified that after appellants were served with the garnishment on October 28, he ordered Brooks to stop work on the new home construction until further notice. Brooks denies this; he and several of the subcontractors on the project testified that work continued through November and December.

On Friday, December 13, Brooks hand-delivered a copy of a second draw request to appellants at their existing home on Stepdown Cove. This request, for $98,201.63, or 24.5% of the construction loan amount, purportedly included framing of the walls (assigned 10% under the draw schedule), roof framing and sheathing (4%), exterior wall sheathing (1%), cornice and soffit (2%)[8], furnace ducts (4%) and wiring rough-in (2%). Additionally, Brooks requested 1.5% for partial work on the windows, door, and garage; the draw schedule assigned 3% for the completed stage.

Brooks left the second draw request in appellants' mail box. The front page of the request was a fax cover sheet addressed to NCM. In the subject line, Brooks hand-wrote "2nd DRAW Request," and in the space reserved for comments he wrote the following:

> I thought I'd get you the Draw Request to you so that you'll have it Monday. Everything is progressing next week with the [Settlement] Agreement and All is Looking well. If you have any questions please call me at your Earliest Convenience.
>
> All Bills are paid and I'm getting lien waivers signed.
>
> [signed] Jon H. Brooks

---

[8] These items are part of the roof.

9

Brooks faxed the request to NCM on the same day or the next day. It is undisputed that appellants received this request on or about December 13 but did not object or otherwise contact Brooks or NCM concerning it.

Appellants assert that around the time Brooks settled the Yetter suit, Brooks broached the possibility of submitting a second draw request, and that Dix had instructed him not to submit the request until appellants sought advice from their attorney. Appellants claim they were outraged when, a few days later, they found the draw request in their mailbox.

Brooks denied that appellants had instructed him not to submit the second draw request. Brooks explained that he had left the copy in appellants' mailbox because he had come to their house, saw the garage open with two cars inside, concluded that appellants were home, but that no one had answered the front door. Brooks acknowledged that he faxed the request to NCM on the same day or the next day; he explained that NCM would not release the funds until it had inspected the work, so he wanted to get the process started, but that NCM's ten-day delay would afford appellants ample time to raise any concerns. Brooks thought that he made it obvious to appellants that he would be submitting the request to NCM; among other things, the front page of the request was a fax cover sheet addressed to NCM and his handwritten note advised appellants, "If you have any questions please call me at your Earliest Convenience." Brooks introduced evidence of the construction contract and loan agreement terms, which did not require appellants' prior approval for the second draw, but required them to object within five days if the work for which the draw was requested did not meet the plans and specifications.

10

Appellants explained that they did not respond to the second draw request because they had understood that, as with the first draw, Brooks could not obtain the funds unless and until they approved it.[9]

NCM received the second draw request and sent an inspector to review Brooks' work. The NCM inspector determined that Brooks was entitled to payment for only two of the construction stages listed in the second draw: wall framing (10%), and roof framing and sheathing (4%)), for a total of 14% of the construction contract amount. However, NCM then made an internal math error: it added this 14% to the 14% that it had paid Brooks in the first draw, for a total of 28% of the construction contract amount. Because Brooks had requested a lesser amount of 24.5%, and not hearing any objection from appellants, NCM funded the entire amount Brooks had requested. It wired $98,201.63 to Brooks's bank account—including what NCM later claimed was a $42,086.41 overpayment—on December 23, the same day that Brooks paid the Yetter settlement. It is undisputed that Brooks never repaid this alleged overpayment, although NCM later credited the amount back to appellants' loan balance.

Appellants later emphasized that the amount of NCM's alleged overpayment, $42,086.41, is a few hundred dollars less than the $42,500 Yetter settlement he paid on the same day, and insinuated that Brooks intentionally inflated the second draw request to fund the settlement.

---

[9] Appellants also argue that a November 22 letter from Brooks implies that he would follow the same process as the first draw with any subsequent draws. This letter notified appellants that he had received the first draw on October 1, explained the process by which he had obtained the draw, and stated that he had paid all invoices and obtained lien waivers from each contractor who had performed work related to that draw.

Brooks dismissed any connection between the draw and the settlement, testifying that he funded the Yetter settlement with money paid to him by his father-in-law, who had not demanded to be repaid.

Appellants also later accused Brooks of making misrepresentations in the supporting documentation accompanying the second draw request. Along with the document listing completed construction stages and corresponding authorized draw percentages, Brooks had submitted a document titled "Draw Request to Owner and Lender" on which he itemized figures for various materials and subcontractor labor related to the construction stages he listed on the other document. The total of these figures matched the $98,201.63 requested draw amount. Brooks checked a box on the document indicating that the items "have been paid for." Brooks later admitted that the dollar amounts he assigned to each item exceeded the amounts he had actually paid for materials and to his subcontractors, and several of his subcontractors corroborated this account.

Brooks denied that he had inflated the amount of the second draw, maintaining that he had determined the amount in a manner consistent with the draw schedule, his first draw request, and industry standards. Brooks testified, as did many of his subcontractors, that the work Brooks claimed in the second draw request had actually been completed, and Brooks suggested that he had completed even more work than he had claimed in the request. As for the itemizations in the "Draw Request to Owner and Lender," Brooks explained that, consistent with industry practice, he had simply allocated the total authorized draw amount to the various categories of work that had been performed, and that any discrepancies reflected allowable profit. Brooks points out that a NCM representative testified that the bank was not concerned with the precise amount that each subcontractor was paid, only that each subcontractor got paid so there were no liens.

12

On December 30, appellants claimed that they learned for the first time that NCM had funded the second draw request. Contending that this was the "final straw," appellants sent a letter to Brooks directing him "**TO STOP ALL WORK**" on the new home construction and indicating that they would be consulting with their attorney. A January 3, 2003, letter from appellants' counsel at the time notified Brooks that the construction contract was terminated effective immediately.

**Proceedings below**

On March 4, 2003, Brooks filed suit against appellants, and appellants counterclaimed. Trial began on March 2, 2004. During trial, appellants sought and were granted leave, over objection, to file an amended pleading adding, for the first time, a breach of fiduciary duty claim against Brooks relating to his conduct in obtaining the second draw. The district court submitted the following claims and defenses to the jury:

- Brooks's claim against appellants for breach of the new home construction contract; and, conditioned on an affirmative finding, appellants' affirmative defenses of anticipatory breach and payment.

- Brooks's claim against appellants on an open account related to Brooks's work on appellants' existing home; and, conditioned on an affirmative finding, appellants' affirmative defenses of judicial estoppel and payment.

- Brooks's quantum meruit theory against appellants related to his work on appellants' existing home.

- Appellants' claim against Brooks for breach of the new home construction contract; and, conditioned on an affirmative finding, Brooks's affirmative defenses of waiver, equitable estoppel, and anticipatory breach.

- Appellants' unjust enrichment claim against Brooks related to the second draw.

13

- Appellants' breach of fiduciary duty claim against Brooks related to the second draw.

- Appellants' DTPA breach of warranty claim related to Brooks's new home construction; and, conditioned on an affirmative finding, whether such conduct was committed knowingly.

- Appellants' fraud claim against Brooks related to Brooks's new home construction.

- Conditioned on affirmative findings regarding appellants' breach of contract and fraud claims, Brooks' affirmative defense of ratification.

The jury found in the affirmative on each of Brooks's liability claims and against appellants on their affirmative defenses. It also found against appellants on each of their claims. The jury awarded Brooks $42,000 on his claims for appellants' breach of the construction contract, $4,400 on Brooks's claim on an open account for work performed on appellants' existing home, and $2,100 on Brooks's *quantum meruit* claim regarding that work.

On May 7, 2004, appellants filed a motion for new trial based on claims of newly-discovered evidence. Appellants claimed that after the verdict, they discovered for the first time that their new home's foundation had been poured on loose fill. They argued that if the jury had known that Brooks had poured the foundation on loose fill, it would likely have found in their favor on their affirmative defense of anticipatory breach. The district court denied appellants' new trial motion.

The district court rendered judgment on the verdict and awarded $50,000 in trial-level attorney's fees, $10,000 in conditional fees for an unsuccessful appeal to the court of appeals, and another $5,000 for an appeal to the Texas Supreme Court. This appeal followed.

14

## DISCUSSION

Appellants bring five issues primarily challenging portions of the judgment relating to the new home construction at 9221 Simmons Road; they do not contest the part of the judgment awarding damages to Brooks on his claims relating to his work on appellant's home at 7500 Step Down Cove. In their first two issues, appellants challenge the underpinnings of Brooks's award of $42,000 in actual damages and attorney's fees on his breach-of-contract claim. First, appellants challenge the legal and factual sufficiency of the evidence supporting the jury's finding that Brooks complied with his fiduciary duty to them. Based on that contention, appellants argue in their second issue that Brooks's breach of fiduciary duty constitutes a material breach of the contract that would excuse their subsequent termination of the contract as a matter of law.[10] In response to these issues, Brooks urges in a cross-point that the district court abused its discretion in granting appellants leave to amend their pleadings at trial to add their breach of fiduciary duty theory and that the issue should not have been submitted to the jury.

In their third issue, appellants challenge the legal and factual sufficiency of the jury's $42,000 damages award on Brooks's claim for breach of the construction contract. In their fourth issue, they contend that the district court abused its discretion in awarding $15,000 in contingent appellate attorney's fees. In their fifth issue, appellants contend that the district court abused its discretion in denying its motion for new trial based upon newly discovered evidence.

---

[10] For the same reasons, appellants also argue that Brooks's breach of fiduciary duty would entitle them to damages under their breach of contract theory. They seek either a judgment awarding them damages or a new trial.

15

**The breach of fiduciary duty finding**

In their first issue on appeal, appellants assert that there is legally and factually insufficient evidence to support the jury's finding that Brooks complied with his fiduciary duty to appellants. We disagree.

We will sustain a legal sufficiency point if the record reveals: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362-63 (1960)). The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *See id.* at 827.

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (*citing Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). But more than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.* (*citing Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). We review the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *See City of Keller*, 168 S.W.3d at 807.

16

We emphasize that jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. *Id*. at 819. When there is conflicting evidence, it is the province of the jury to resolve such conflicts. *Id.* at 820. If conflicting inferences can be drawn from the evidence, we assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences. *Id*. at 821. But if the evidence allows only one inference, we may not disregard it. *See id.* So long as the evidence falls within a zone of reasonable disagreement, we may not substitute our judgment for that of the trier-of-fact. *See id.* at 822.

When reviewing a challenge to the factual sufficiency of the evidence, we must consider, weigh, and examine all of the evidence in the record. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). If a party is attacking the factual sufficiency of an adverse finding on an issue to which the other party had the burden of proof, the attacking party must demonstrate that there is insufficient evidence to support the adverse finding. *Westech Eng'g, Inc. v. Clearwater Constructors, Inc*., 835 S.W.2d 190, 196 (Tex. App.—Austin 1992, no writ). We should set aside the verdict only if the evidence that supports the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

The starting point for our analysis of appellants' evidentiary sufficiency challenges is the charge as submitted to the jury. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 762 (Tex. 2003) (factual sufficiency); *Ancira Enters., Inc. v. Fischer*, 178 S.W.3d 82, 93 (Tex. App.—Austin 2005, no pet.).

17

The focus of our inquiry, then, is Question 9, in which the jury was asked, "Did Jon Brooks comply with his fiduciary duty to Dahlia Gutierrez and George Dix?"  The jury was instructed that to prove he complied with his duty Brooks had to show, by a preponderance of the evidence, that:

    a.    The transaction in question was fair and equitable to Dahlia Gutierrez and George Dix;

    b.    Jon Brooks made reasonable use of the confidence that Dahlia Gutierrez and George Dix placed in him;

    c.    Jon Brooks acted in the utmost good faith and exercised the most scrupulous honesty toward Dahlia Gutierrez and George Dix;

    d.    Jon Brooks placed the interests of Dahlia Gutierrez and George Dix before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Dahlia Gutierrez and George Dix, and did not place himself in any position where his self-interest might conflict with his obligations [as] a fiduciary; and

    e.    Jon Brooks fully and fairly disclosed all important information to Dahlia Gutierrez and George Dix concerning the transaction.[11]

The jury answered this question in the affirmative.

The "transaction" referenced in this jury instruction was the second draw, in which Brooks obtained $98,201.63 from NCM.  Appellants contend that there is legally or factually insufficient evidence that, in connection with the second draw, Brooks "exercised the most

---

[11]  On appeal, Brooks does not dispute the existence of a fiduciary duty or challenge the manner in which the district court submitted appellants' fiduciary duty claim other than to contend that the district court abused its discretion in permitting appellants to amend their pleadings at trial to add this claim.

scrupulous honesty" toward appellants, placed appellants' interests before his own, and "fully and fairly disclosed all important information" to appellants. But appellants' contentions are predicated largely upon disputed factual assertions, including appellants' claims that: (1) on December 10, Dix told Brooks to wait on sending a second draw request until appellants could confer with their attorney on how to proceed in light of the Yetter settlement, and (2) Brooks inflated the amount of the second draw request. We have previously reviewed the evidence relevant to these assertions. It includes Brooks's testimony denying that appellants ever told him not to submit his second draw request and explaining how he calculated the second draw amount and why it was correct. We conclude that Brooks met his burden of adducing legally and factually sufficient evidence to enable a reasonable jury to reject appellants' view of these pivotal facts.

Appellants also contend that, in essence, Brooks did not do enough to alert them that he was submitting the second draw request to NCM at or around the same time he left a copy at their home. They emphasize that (1) Brooks did not specifically inform them that he was faxing the draw request to NCM, (2) Brooks had not proceeded with the first draw request until after they had approved it, and (3) Brooks had sent appellants a letter outlining the procedure he had used when submitting the first draw request and did not affirmatively state that he would follow a different procedure in future draws. Appellants also urge that Brooks's handwritten note on the cover sheet—specifically, the portion where he wanted them to "have it for Monday"—implied that he was awaiting their approval before proceeding. Viewing the record as a whole, *see City of Keller*, 168 S.W.3d at 807; *Plas-Tex*, 772 S.W.2d at 445, we conclude that the evidence was legally and factually sufficient to permit a reasonable jury to conclude that Brooks had fully and fairly disclosed that he

19

was submitting the second draw request, placed appellants' interests ahead of his own, and acted with scrupulous honesty in that regard. Among other evidence, the jury could have considered the language of the construction contract and loan agreement, which required prior approval only of the first draw and otherwise gave them five days to object; that the first page of appellants' copy was a fax cover sheet addressed to NCM; that Brooks's handwritten note invited appellants' comments and questions; and that Brooks had hand-delivered the copy to appellants' home and attempted to present it to them in person.

Concluding that there is legally and factually sufficient evidence to support the jury's finding that Brooks complied with his fiduciary duty to appellants in regard to the second draw, we overrule appellants' first issue on appeal. In light of this disposition, we need not reach either appellants' second issue or Brooks's cross-point.

**Damages**

In their third issue, appellants challenge the legal and factual sufficiency of the jury's award of $42,000 on Brooks's contract claim. Again, we start with the charge actually submitted to the jury. *Golden Eagle*, 116 S.W.3d at 762; *Osterberg*, 12 S.W.3d at 55. In pertinent part, the jury was instructed that when calculating the amount of damages:

> [Y]ou should consider the following elements of damages, if any, and none other: The amount [appellants] agreed to pay Jon Brooks under the Residential Construction Contract, less the expenses that Jon Brooks saved by not completing the construction of the residence, and less the amounts that were previously paid to Jon Brooks under the contract.

20

As previously discussed, it is undisputed that appellants agreed in the construction contract to pay Brooks $525,823, $400,823 of which represented the total construction cost, and that Brooks was paid a total of $150,559.73 in his two draws under the contract. Subtracting Brooks's payments from the contract amount yields a net amount of $375,263.27. Appellants complain that there was no evidence of the remaining variable that the jury was instructed to subtract from that sum, "the expenses that Jon Brooks saved by not completing the construction of the residence," and thus legally or factually insufficient evidence to support the $42,000 figure the jury ultimately found. Appellants further insinuate that the jury likely chose the $42,000 figure for purely symbolic reasons related to the second draw dispute. We conclude that the jury's damage award is supported by legally and factually sufficient evidence.

As appellants acknowledge, Brooks testified that he had calculated his contract damages under the formula in the jury instruction and arrived at a figure of $67,000 "and some change." Appellants' characterize Brooks's damage calculation as merely a "lump sum," and equate the jury's award of a lesser figure to the situation in *First State Bank v. Keilman*, 851 S.W.2d 914 (Tex. App.–Austin 1993, writ denied). In *Keilman*, the jury heard evidence that damages were either $7,161.44 or zero, yet awarded $360. *Id*. at 929. We held that no evidence supported this award, as it was "inexplicable in light of the evidence" and "it appear[ed] that the jury pulled a number out of a hat." *Id.* at 931.

Appellants' characterization of the record overlooks such evidence as Brooks's initial cost estimates of all of the labor and material that would go into the new home[12] and evidence

---

[12] Plaintiff's Exhibit 23.

regarding the work that had been completed at the time of termination. This evidence supplied a basis for the jury rationally to ascertain the expenses Brooks would save from not completing construction,[13] and, thus, the net amount of contract damages to which he was entitled.

Juries have broad discretion in assessing damages where the law provides no precise legal measure; a jury's findings will not be disregarded merely because its reasoning in arriving at its figures may be unclear so long as a rational basis for its calculation exists. *McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 201 (Tex. App.—Austin 2005, no pet.); *Swank v. Sverdlin*, 121 S.W.3d 785, 799 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); *Keilman*, 851 S.W.2d at 930. In *McMillin*, we rejected a similar legal and factual sufficiency challenge to a jury's $1000 damage award to the McMillins on their claims that State Farm had breached their homeowner's insurance policy. *McMillin*, 180 S.W.3d at 203. The only explicit reference to a $1000 amount in the record was a speculative suggestion by Mr. McMillin that he might have paid his $1000 deductible twice. *Id*. at 202. Nonetheless, we found legally and factually sufficient evidence to support even the $1000 award where the evidence supported a range of awards between $0 (State Farm's contention) up to $242,382.95 (McMillins' contention). *Id*. at 203. We reasoned:

> This is not like *Keilman* in which the jury had to choose between competing theories on how interest should be calculated. . . . Rather than a binary choice or a series of binary choices, this evidence presented the jury with a range of possible awards. That they chose a round figure near the low end of the range does not invalidate the award.

---

[13] In fact, notes from the jury during its deliberations suggest that it engaged in this inquiry. Among other questions, the jury inquired whether there was a breakdown of the damages claimed by Brooks and whether the damage award had to be a fixed number or could be a range of numbers.

*Id*. We likewise conclude that the evidence here was sufficient to enable reasonable jurors to chose from a range of possible damage awards that included the $42,000 amount it ultimately awarded. We overrule appellants' third issue.

**Appellate attorney's fees**

In their fourth issue on appeal, appellants complain that the district court abused its discretion in awarding a total of $15,000 in contingent appellate attorney's fees to Brooks. In lieu of presenting evidence on attorney's fees at trial, the parties stipulated the following:

> Reasonable and necessary attorney's fees incurred by Brooks through completion of trial in this case are $50,000.00. . . .
>
> If, upon final trial, the court finds that attorney's fees are recoverable, then the parties agree and stipulate that the above amounts may be awarded and that no evidence shall be required or presented at trial or post-trial regarding the amount of fees incurred, regardless of whether the fees are reasonable and necessary or regarding allocation of fees to any cause(s) of action for which fees are awarded or recoverable.

When awarding appellate attorney's fees, the district court relied on section 38.004 of the civil practice and remedies code, which authorizes trial courts to "take judicial notice of the usual and customary attorney's fees and the contents of the case file without receiving further evidence" in either a bench trial or "a jury case in which the amount of attorney's fees is submitted to the court by agreement." Tex. Civ. Prac. & Rem. Code Ann. § 38.004 (West 1997). Under section 38.004, a trial court has discretion to award attorney's fees in the event of an appeal even though no evidence is offered on the matter. *See Gill Sav. Ass'n v. Chair King, Inc.*, 797 S.W.2d 31, 32 (Tex. 1990); *Superior Ironworks, Inc. v. Roll Form Prods., Inc.*, 789 S.W.2d 430, 431 (Tex. App.—Houston [1st Dist.] 1990, no writ). Whether to award any party attorney's fees rests in the sound discretion of the

23

trial court, and its judgment will not be reversed absent a clear showing that it abused its discretion. *McCord v. Watts*, 777 S.W.2d 809, 813 (Tex. App.—Austin 1989, no writ).

The parties dispute whether their stipulation was an agreement to submit the issue of appellate attorney's fees to the district court so as to invoke section 38.004. Appellants construe the stipulation to be limited only to trial-level attorney's fees, leaving appellate attorney's fees outside of section 38.004 and governed by the usual requirements of proof. Because Brooks did not put on evidence of attorney's fees nor obtain a jury finding on that issue, appellants contend that the district court abused its discretion in awarding him those fees.

Brooks responds that the stipulation removed the entire issue of attorney's fees—both trial- and appellate-level—from the jury and submitted them to the district court. He emphasizes language that the stipulated (trial-level) amounts may be awarded, "If, upon final trial, the court finds that attorney's fees are recoverable." In other words, Brooks maintains that the stipulation's reference to trial-level attorney's fees did not define the stipulation's scope, but merely represented the parties' agreement concerning one of the attorney's fees elements they had agreed to submit to the district court. Appellate attorney's fees, Brooks contends, could thus be determined by the district court under section 38.004.

A stipulation is "an agreement, admission, or other concession made in a judicial proceeding by the parties or their attorneys respecting some matter incident thereto." *Shepherd v. Ledford*, 962 S.W.2d 28, 33 (Tex. 1998). It constitutes a binding contract between the parties, may be used to limit or exclude the issues to be tried, and even obviates the need for proof on the litigable issue. *ExxonMobil Corp. v. Valence Operating Co.*, 174 S.W.3d 303, 311 (Tex. App.—Houston [1st Dist.] 2005, pet. filed). As with all contracts, when construing a stipulation, the court must

24

determine the intent of the parties from the language used in the entire agreement, examining the surrounding circumstances, including the state of the pleadings, the allegations made therein, and the attitude of the parties with respect to the issue. *See id*.; *Discovery Operating, Inc. v. Baskin*, 855 S.W.2d 884, 886-87 (Tex. App.—El Paso 1993, orig. proceeding). A stipulation should not be given greater effect than intended and should not be construed as an admission of a fact intended to be controverted. *Austin v. Austin*, 603 S.W.2d 204, 207 (Tex. 1980).

We agree with Brooks that the district court had authority under section 38.004 to take judicial notice of and award appellate attorney's fees. Construing the stipulation as a whole, we conclude that it had the effect of removing the entire issue of attorney's fees from the jury trial and submitting it to the district court. The title of the stipulation is "Stipulation on Attorney's Fees"—not merely trial-level attorney's fees—and it contemplates broadly that "no evidence shall be required or presented at trial or post-trial regarding the amount of fees incurred, regardless of whether the fees are reasonable and necessary or regarding allocation of fees to any cause(s) of action for which fees are awarded or recoverable." Having placed the attorney's fees issue before the district court, the fact that the parties agreed to a fixed amount only of trial-level fees would not alone preclude the district court from additionally awarding appellate fees under section 38.004. The parties merely left unaddressed the amount of appellate attorney's fees; they did not state that no such fees would be awarded. Our conclusion is further supported by the legislature's instruction that chapter 38 "shall be liberally construed to promote its underlying purposes." Tex. Civ. Prac. & Rem. Code Ann. § 38.005 (West 1997). The district court did not abuse its discretion in taking judicial notice of usual and customary appellate attorney's fees and the contents of the case file, and awarding appellate attorney's fees on that basis. We overrule appellants' fourth issue.

25

**Newly discovered evidence**

In their fifth issue on appeal, appellants assert that the district court abused its discretion in denying their motion for new trial on the basis of "newly-discovered evidence" that Brooks had poured their foundation on loose fill. We will not disturb the district court's decision to deny a motion for new trial absent an abuse of discretion. *Trinity Indus. v. Ashland, Inc.*, 53 S.W.3d 852, 869 (Tex. App.—Austin 2001, pet. denied). A party moving for a new trial based upon the existence of newly discovered evidence has the burden of showing: (1) admissible, competent evidence showing the existence of the newly discovered evidence; (2) the evidence has come to the party's attention since trial and the party had no notice of its existence before trial; (3) the party used due diligence to procure the evidence before trial; (4) the evidence is not merely cumulative of that already presented and does not tend only to impeach the testimony of the adversary; and (5) the evidence would probably produce a different result if a new trial were granted. *Connell Chevrolet Co. v. Leak*, 967 S.W.2d 888, 894 (Tex. App.—Austin 1998, no pet.). We conclude that the district court did not abuse its discretion in concluding that appellants did not meet this standard.

Regarding the due diligence element, we have held that "diligence has not been exercised if the same effort used to procure the testimony subsequent to trial would have had the same result if exercised prior to trial." *Dorbandt v. Jones*, 492 S.W.2d 601, 603 (Tex. Civ. App.—Austin 1973, writ ref'd n.r.e.). The contractor who purportedly first discovered that the foundation had been poured upon loose fill, foundation repair contractor Raymond Wendland, testified at the hearing on appellants' new trial motion that appellants first contacted him on April 9 or 10, after finding his name in the phone book. Wendland claimed that the foundation problem would have been obvious to anyone who had dug a trench to investigate it and that he did not need

26

to perform tests to ascertain that the house had been built on loose fill. Wendland added that he would have discovered the problem, if appellants had asked him to investigate, as early as February 2004, October 2003, or August 2003.

Gutierrez also testified at the hearing, admitting that she had been aware before trial that the lot had drainage problems impacting the foundation and that she and her husband had raised numerous complaints about Brooks's work while he was on the project. Additionally, at trial, appellants testified extensively regarding their concerns with Brooks's work, that they had consulted several engineers to investigate the foundation before approving Brooks's first draw request, and that one of the engineers had suggested digging a hole near the foundation to examine it.

We conclude that the district court did not abuse its discretion in denying appellants' motion for new trial. We overrule appellants' fifth issue.

## CONCLUSION

Having overruled each of appellants' issues on appeal, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith and Pemberton

Affirmed

Filed: April 7, 2006

27