TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN















TEXAS COURT OF APPEALS, THIRD
DISTRICT, AT AUSTIN

 

 

 

NO. 03-05-00099-CV

 

 

 

Appellant, David T.
Phillips//Cross-Appellant, Estate of Phillip O. Poulin

 

v.

 

Appellees, Estate of Phillip O. Poulin//Cross-Appellees, David T.
Phillips

 

 

 

FROM PROBATE COURT NO. 1
OF TRAVIS
 COUNTY, NO.
73677-b,

HONORABLE GUY S. HERMAN, JUDGE PRESIDING

 

 

M E M O R A N D U
M   O P I N I O N

 

 

                        David
T. Phillips and the estate of a business partner, Phillip O. Poulin, each
appeal from a judgment awarding the Estate $11,300 in damages on its claims
against Phillips for breach of fiduciary duty and denying Phillips recovery on
his counterclaims against the Estate. 
For the reasons explained below, we affirm the judgment.

                        This is one of two
related appeals arising from a dispute between Phillips and the Estate.  During his lifetime, Poulin had invested in
two real estate-related general partnerships with Phillips, and owned
50-percent shares with Phillips in a corporation that managed properties
including those owned by the two partnerships. 
Phillips kept the books for these entities, though it is undisputed that
both men had access to the entities’ books and bank accounts, and could issue
checks.  Poulin died in November
1998.  Upon his death, it is undisputed that
the Estate succeeded to Poulin’s interests in the three entities.

class=Section2> 

                        As Poulin’s heirs
attempted to settle his affairs thereafter, they raised questions concerning certain
transactions by Phillips involving these entities and encountered what they
perceived to be resistance when seeking information from Phillips.  The Estate eventually filed suit against
Phillips seeking an accounting of their respective interests in the
entities.  Phillips counterclaimed,
alleging in part that Poulin had breached the partnership agreements by
improperly paying himself funds and that he and the Estate had failed to make
required contributions.  The Estate later
amended its petition to add claims against Phillips for breach of fiduciary
duty, alleging that Phillips had engaged in self-dealing transactions that were
unfair to the Estate’s interests, and sought a constructive trust on certain
assets.

                        The probate court
severed the Estate’s accounting claim from the Estate’s breach-of-fiduciary
duty claims and Phillips’s counterclaim. 
The accounting claim is the subject of our opinion and judgment in Cause
No. 03-05-00098-CV, which we also issue today.[1]  The present cause concerns the Estate’s
breach-of-fiduciary duty claims and Phillips’s counterclaims.

                        We will discuss the
evidence pertaining to each of these claims as it becomes relevant to our
analysis.  The claims were tried to the
probate court over two several days. 
Phillips, whose attorney had withdrawn by this juncture, represented
himself at trial.  Following trial, the
probate court rendered judgment that the Estate “should recover $11,300 from
[Phillips] by reason of [Phillips’s] breach of fiduciary duty, and that all
further relief should be denied.”  The
court also ordered that Phillips take nothing on his counterclaims.  Both the Estate and Phillips appeal from this


class=Section3> 

judgment,
raising legal and factual sufficiency challenges to the evidence supporting
various findings (or failures-to-find facts) implied by the judgment.

 

Standard and scope of review

                        The probate court’s
judgment does not elaborate on its basis for awarding “$11,300 from [Phillips]
by reason of [Phillips’s] breach of fiduciary duty.”  Nor did the probate court prepare findings of
fact and conclusions of law, and neither party requested it to do so.  In such instances, we must affirm the
judgment on any theory of law applicable to the case that is supported by the
evidence.  Anderson Mill Mun. Util. Dist. v. Robbins, No. 03-04-00369-CV, 2005
Tex. App. LEXIS 7482, at *12 (Tex. App.—Austin Sept. 8, 2005, no pet.); Vickery v. Commission for Lawyer Discipline,
5 S.W.3d 241, 251-52 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).  The parties may, however, challenge the
evidence supporting implied findings for legal and factual sufficiency.  BMC
Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 795 (Tex. 2002).

                        When reviewing the legal
sufficiency of the evidence, we view the evidence in the light most favorable
to the challenged finding and indulge every reasonable inference that would
support it.  City of Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005).  We must credit favorable evidence if a
reasonable fact-finder could and disregard contrary evidence unless a
reasonable fact-finder could not.  Id. at 827.  There is legally insufficient evidence or “no
evidence” of a vital fact when (a) there is a complete absence of evidence of a
vital fact; (b) the court is barred by rules of law or of evidence from giving
weight to the only evidence offered to prove a vital fact; (c) the evidence
offered to prove a vital fact is no more than a mere scintilla; or (d) the
evidence conclusively establishes the opposite of the vital fact.  Merrell
Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 

class=Section4> 

711 (Tex.
1997).  More than a scintilla of evidence
exists to support a finding if the evidence would allow reasonable and
fair-minded people to differ in their conclusions.  Id.

                        When a party challenges
the legal sufficiency of an adverse finding on an issue on which that party had
the burden of proof, that party must demonstrate on appeal that the evidence
conclusively establishes all vital facts in support of the issue.  Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam).  When reviewing this type of legal sufficiency
challenge, we must first examine the record for evidence that supports the
finding.  If there is no evidence to
support the finding, we then examine the entire record to determine if the
contrary proposition is conclusively established.  Id.  The point of error will be sustained if the
contrary proposition is conclusively established.  Id.

                        A party attacking the
factual sufficiency of an adverse finding on an issue on which that party did
not have the burden of proof at trial must show on appeal that there is
insufficient evidence to support the adverse finding.  Vongontard
v. Tippit, 137 S.W.3d 109, 112 (Tex. App.—Houston [1st Dist.] 2004, no
pet.).  In our review of this issue, we
examine the entire record and consider and weigh all the evidence, both in
support of, and contrary to, the challenged finding.  Id.  We must uphold the finding unless the
evidence that supports it is so weak as to be clearly wrong or unjust.  Cain v.
Bain, 709 S.W.2d 175, 176 (Tex. 1986)
(per curiam).  A party challenging
the factual sufficiency of an adverse finding on an issue on which that party
had the burden of proof at trial must demonstrate on appeal that the adverse
finding is against the great weight and preponderance of the evidence.  Dow
Chem. Co., 46 S.W.3d at 242.  To
conduct this review, we must consider and weigh all of the evidence, and we can
set aside a verdict only if the 

class=Section5> 

evidence is so
weak or if the finding is so against the great weight and preponderance of the
evidence that it is clearly wrong and unjust. 
Id.

                        The
parties’ issues and claims concern several discrete sets of transactions, and
are best grouped for discussion along those lines.

 

Y&O, Inc. salary distribution

                        The
probate court heard evidence that Phillips and Poulin each owned 50% of the
shares in Y&O, Inc.  Poulin was
Y&O’s president, and Phillips its vice-president.  Y&O held contracts to manage various
apartment properties.  Income from these
management contracts was paid to Poulin and Phillips as officer salaries.  The Y&O general ledgers from the year
preceding Poulin’s November 28, 1998 death reflected the following salary payments:

 

 


 
 
 Date
 
 
 Poulin
 
 
  Phillips
 
 
 
 
 12/2/97
 
 
 $   1,700
 
 
 $   1,700
 
 
 
 
 1/5/98
 
 
 $   1,700
 
 
 $   1,700
 
 
 
 
 1/15/98
 
 
 $   1,758
 
 
 $   1,758
 
 
 
 
 2/12/98
 
 
 $   1,850
 
 
 $   1,858
 
 
 
 
 3/16/98
 
 
 $   1,500
 
 
 $   1,500
 
 
 
 
 4/14/98
 
 
 $   3,750
 
 
 $   3,750
 
 
 
 
 5/15/98
 
 
 $   1,900
 
 
 $   1,900
 
 
 
 
 6/15/98
 
 
 $   1,700
 
 
 $   1,700
 
 
 
 
 6/29/98
 
 
 $   1,000
 
 
 $   1,000
 
 
 
 
 7/15/98
 
 
 $   2,200
 
 
 $      620
 
 
 
 
 8/18/98
 
 
 None
 
 
 $      700
 
 
 
 
 9/1/98
 
 
 $ 11,300
 
 
 $      700
 
 
 
 
 10/1/98
 
 
 $   2,250
 
 
 $   1,000
 
 
 
 
 11/1/98
 
 
 $      466
 
 
 $      466
 
 





 








During this period, Phillips and
Poulin had agreed to split Y&O income 50-50%.  While many of the salary payments reflected
in the ledger are consistent with this arrangement, some are not.  In total, Poulin received $12,730 more in
salary during this period than Phillips. 
The largest single component of the difference is a $11,300 payment to
Poulin on September 1.

                        The
parties agree that this ledger entry reflects a check drawn on Y&O that Poulin
wrote himself on September 1 in the amount of $11,300.  On the check was written the notation
“Dividend 9000” and “Sept Mgm 2300.”  The
parties concur that Poulin had intended this check to both pay his monthly
officer’s salary and split with Phillips $18,000 of the proceeds of a $20,000
credit in late August for “Stock Sale.” 
Around the same time, Phillips wrote himself a $9,000 check drawn on
Y&O with the notation, “Stock Sale Proceeds.”  Unlike Poulin’s check, Phillips’s check is
not reflected in the Y&O ledger as salary, and there was no evidence
specifying where or how it might have been reflected in Y&O’s books.

                        The
Y&O general ledger reflects the following salary payments in the aftermath
of 

Poulin’s death:


 
 
 Date
 
 
 Poulin
 
 
 Phillips
 
 
 
 
 12/1/98
 
 
 $ 1,600
 
 
 $ 3,300
 
 
 
 
 12/9/98
 
 
 None
 
 
 $ 2,300
 
 
 
 
 1/1/99
 
 
 None
 
 
 $ 2,800
 
 
 
 
 1/1/99
 
 
 None
 
 
 $ 6,000
 
 


 

It was undisputed that Phillips
caused these salary payments to be made to himself.  The amounts of these payments were generally larger
than those he had received during the previous year and exceeded the amount
Poulin or his Estate received during the same period.

class=Section7> 

                        The
Estate alleged that Phillips had breached his fiduciary duties to the Estate in
connection with his salary payments following Poulin’s death.  At trial, Phillips countered these
allegations in part by explaining that these salary payments merely offset
salary amounts that Poulin had previously been overpaid relative to their
agreed-upon percentage distribution.  He
emphasized that when all of the salary payments reflected in the Y&O
general ledger between December 1997 and January 1, 1999 are totaled (including
the $11,300 check to Poulin and Phillips’s salary payments following Poulin’s
death), Poulin received a net $2,030 more than Phillips.  Phillips also maintained that (1) he and
Poulin had agreed to split Y&O income 60%-to-Phillips, 40%-to-Poulin from
1994 through June 1997,[2]
(2) Poulin had consistently received (or paid himself) more than his proportionate
share, (3) in an amount totaling $18,792.90 for the period 1994 through January
1, 1999.  In one of his counterclaims
against the Estate, Phillips sought recovery of these alleged overpayments to
Poulin.

                        At
trial, Phillips introduced a spreadsheet purporting to reflect his and Poulin’s
respective actual salary figures, purportedly derived from Y&O tax returns;
the salary each should have received at the alleged agreed-upon percentage
distributions; and what he asserts were his annual underpayments, totaling
$18,792.90.  The totals incorporated in
the spreadsheet appear to include both Poulin’s $11,300 check and Phillips’s
salary payments to himself following Poulin’s death.[3]

class=Section8> 

                        The
Estate argued that the evidence supported the inference that Phillips had
caused Poulin’s $11,300 check to be reflected entirely as salary (while only
$2,300 was actually salary, and the rest a dividend) as part of a scheme to
inflate the amounts the Y&O books stated that Poulin had received as salary,
enabling Phillips to later claim that he was owed offsetting amounts in salary.[4]                  In his first issue, Phillips
challenges the legal and factual sufficiency of an implied finding that the
Estate incurred any damage from “the alleged miscoding” of Poulin’s $11,300
check.  Specifically, Phillips insists
that “[n]o evidence demonstrated that Phillips received more than Poulin in
connection with that stock sale . . . [n]or was there any evidence that Poulin
received any less money, as salary or otherwise, in connection with the stock
sale, despite the apparent mischaracterization of Poulin’s $11,300 check on the
books.”  In his second issue,[5]  Phillips asserts that the evidence
conclusively establishes his entitlement to judgment on his counterclaim for
$18,792.90 in alleged underpayments of Y&O salary relative to Poulin and
that the probate court’s failure to render that award is against the great
weight and preponderance of the evidence.

                        It
is undisputed that within approximately five weeks after Poulin’s death,
Phillips had $14,400 paid to himself, ostensibly for salary, in checks of
$6,000, $2,800, $2,300 and $3,300. As a fiduciary, Phillips had the burden of
establishing the fairness of these transactions.  Texas Bank & Trust Co. v.
Moore, 595 S.W.2d 502, 509 (Tex. 1980);
Estate of Townes v. Townes, 867 S.W.2d 414, 417 (Tex. App.—Houston [14th
Dist.] 1993, writ denied).  The evidence
is legally and factually sufficient to support the probate court’s implied
finding that Phillips failed to meet that burden.  To establish the fairness of the salary
payments he made to himself, Phillips attempted to justify them as his attempts
to offset prior overpayments of salary to Poulin.  But Phillips acknowledges that the alleged
salary “overpayments” to Poulin on which he relies included the $11,300 check
that, he acknowledges, was mis-classified by including in Poulin’s salary the
$9,000 component from stock sale proceeds. 
These facts, as well as the haste with which Phillips wrote himself
“salary” checks following Poulin’s death that were substantially larger than
those he had generally received previously, undermine Phillips’s justification
of why the payments were fair.  In
context, the facts also can support the reasonable inference that Phillips, who
kept the businesses’ books, deliberately caused Poulin’s check to be reflected
as salary so as to inflate the corresponding salary amount Phillips could claim
for himself.  Further, the evidence is
legally and factually sufficient to support the probate court’s damages award,
which is well within the $0 to $14,400 range potentially recoverable under the
Estate’s theory.  See McMillian v. State Farm Lloyds, 180 S.W.3d 183, 201-03 (Tex.
App.—Austin 2005, pet. denied).[6]

                        This
conclusion is further supported by our analysis of Phillips’s second
issue.  Phillips’s counterclaim for
$18,792.90 in alleged underpayments of Y&O salary relative to Poulin is
predicated on his contention that he and Poulin had agreed to a 60-40% split of
Y&O income between 1994 and mid-1997. 
Phillips insists that the evidence conclusively establishes the
existence of this agreement.  He points
to the spreadsheet that he introduced into evidence and the testimony of his
bookkeeper, who had prepared the exhibit at his direction.  Phillips did not himself testify regarding
this alleged agreement.  As for the
bookkeeper, her testimony was, at best, equivocal.  While she initially testified that she
understood such an agreement existed, she acknowledged that “I was never—never
saw anything in writing,” nor was there evidence of any written memorialization
of such an agreement.  The bookkeeper
later admitted that she had never been privy to such an agreement and, when
asked whether she knew that Poulin had agreed to the split, conceded that, “I
guess I don’t.”  The probate court could
reasonably have viewed this evidence as failing to establish that there was an
agreement to split Y&O income 60-40%, see
City of Keller, 168 S.W.3d at 819-21, and its failure to find the existence
of such an agreement was not against the great weight and preponderance of the
evidence.[7]  This further undermines Phillips’s
justification of the fairness of the salary payments.

                        We
accordingly overrule Phillips’s first two issues.

 

“Fire job” proceeds 

                        Phillips,
Poulin and others were general partners in Hill Country Partnership, which
owned an apartment complex in San Marcos. 
Poulin owned a 67% share, Phillips owned 22%, and others owned the
remaining 11%.  Hill Country had
insurance coverage for the apartments through Vesta Fire Insurance
Corporation.  After a fire damaged the
apartments, Poulin undertook to act individually as general contractor in
repairing and restoring the property. 
Phillips, on behalf of the partnership, signed a construction agreement
with Poulin, as contractor, stating that the contract price would be the
“[f]ull amount of insurance proceeds as approved by Vesta Insurance.”  At an earlier juncture in this litigation,
the Estate filed a third-party action against Vesta to recover approximately
$28,000 for the remaining balance of expenses incurred in repairing the fire
loss.  The Estate eventually settled with
Vesta, and Vesta was dismissed from the litigation.

                        In
one of his counterclaims, Phillips alleges that Hill Country, not the Estate,
was entitled to any insurance proceeds from the settlement; that the Estate and
its attorney improperly diverted a check for $25,000 in insurance proceeds
payable to Hill Country rather than giving it to the partnership for
distribution; and that Phillips is entitled to a 22% share of the proceeds
($5,500).  In its third issue, Phillips
insists that the evidence conclusively established that the Estate diverted
such a check, or that the probate court’s failure to so find is against the
great weight and preponderance of the evidence. 
He points solely to the testimony of Suzie Poulin, Poulin’s adult
daughter, during Mr. Phillips’s pro se cross-examination of her.  During their exchange, Ms. Poulin
acknowledged that the Estate had received a $25,000 check in the lawsuit
settlement, that the Hill Country Partnership was the named insured on the
policy, but that she did not know whether
the check was made payable to the partnership. 
Especially in light of the construction agreement between Hill Country
and Poulin, the evidence does not conclusively establish Phillips’s entitlement
to a share of the insurance proceeds or that the probate court’s implied
contrary findings are against the great weight and preponderance of the
evidence.  We overrule Phillips’s third
issue.

 

The “Santa Monica Bank” entry

                        Phillips also
counterclaimed seeking recovery of $15,000 that he alleges Poulin wrongfully
took or withheld from Y&O by transferring it to a personal bank account he
held in Santa Monica, California.  In his
fourth issue, Phillips asserts that “uncontroverted evidence” conclusively
establishes his entitlement to judgment on this counterclaim or that the
probate court’s implied contrary findings rejecting that theory were against
the great weight and preponderance of the evidence.  As support, Phillips points to the following
evidence:

 

!         The Y&O general ledger contains an
entry on August 8, 1998, reflecting a payment to “(Santa) Santa Monica Bank” in
the amount of $15,000.

 

!                     Suzie Poulin testified that
Poulin had a bank account in a Santa Monica bank.

Ms.
Poulin also testified that Poulin and his family had investment properties in
Southern California.

 

!         There was testimony that Poulin (like
Phillips) had authority and capacity to endorse a check to himself from the
Y&O account.

 

!                     Poulin had previously
written checks to himself from the Hill Country Partnership account and
deposited into his separate fire job account or the accounts for other personal
enterprises.

 

                        We disagree that this evidence,
without more to elaborate on the nature of the transaction and to connect
Poulin to it, conclusively establishes the combination of inferences necessary
for Phillips to prevail on his counterclaim: 
i.e., that (1) Poulin had made
the payment or caused it to be made; (2) the payment went to someone’s account at “Santa Monica Bank”; (3)
“Santa Monica Bank” was the financial
institution in that city where Poulin has his account; (4) the bank account
into which the money was paid was the one held by Poulin; and (5) that the payment was for Poulin’s personal use or benefit. 
See, e.g., Marathon Corp. v. Pitzner, 106 S.W.3d 724, 728 (Tex.
2003) (inferences stacked only upon inferences is no evidence).  Furthermore, the probate court’s implied
contrary findings are not against the great weight and preponderance of the
evidence. We overrule Phillips’s fourth issue.

 

Litigation expenses

                        In his fifth issue,
Phillips contends that the evidence conclusively establishes his entitlement to
judgment on a counterclaim against the Estate seeking contribution for expenses
Phillips claims he incurred in defending a lawsuit against the Hill Country
Partnership.  In late 2000, Hill Country,
Y&O, Inc., and Phillips were sued in a personal injury action arising from
injuries the plaintiff received during a November 1999 fire at the Hill Country
Apartments.[8]  By that time, Poulin had died, the Estate had
succeeded to his partnership interest, and the Hill Country Apartments had been
sold.  Hill Country’s insurance carrier initially
denied coverage on the claim, but later provided a defense and the case was
settled.  Phillips alleges that, in the
interim, he incurred $21,496.61 in legal fees and other costs defending the
claim on behalf of the partnership.  In
his counterclaim, he seeks what he contends is the Estate’s 67% partnership
share of these expenses, $14,402.72.  He
maintains that the evidence conclusively entitles him to judgment on that claim
or that the probate court’s implied findings to the contrary are against the
great weight and preponderance of the evidence. 
Phillips’s evidence of these expenses consists of:

 

!         legal bills from an attorney,
ultimately totaling $6,190.78, reflecting that all but $1,199.01 of this amount
was paid by Zurich American Insurance Company. 
Each invoice was addressed to Y&O, Inc.  The final invoice was dated May 2002.

 

!         a memorandum, dated December 1, 2001,
from Phillips to “Y&O, Inc.,” regarding “Invoice for Services Representing Corporation”
in the lawsuit, requesting payment of $20,000 (100 hours @ $200 per hour) for
his services in “Representation of Corporation in lawsuit; Extensive review of
all documents.”[9]

 

!         a similar memorandum of the same date
from Phillips’s bookkeeper requesting payment of $297.60 (10 hours @ $29.76 per
hour) for “Assistance provided to corporation and David Phillips in this
lawsuit.”

 

We
conclude that when considered in light of the record as a whole, Phillips’s
memorandum, that of his bookkeeper, and her similarly conclusory trial
testimony concerning these purported expenses[10]
could reasonably have been disregarded as incredible by the probate court.  See
City of Keller, 168 S.W.3d at 820. 
Additionally, these documents, like the attorney’s fee invoices, were
each addressed to Y&O, Inc., not the Hill Country Partnership.  Phillips never elaborates or identifies
evidence explaining why or how the Estate, by virtue of its interest in Hill
Country Partnership, would have liability for the legal expenses of the
corporation.  We overrule Phillips’s
fifth issue.

The Estate’s issue:  The South Cross transaction

                        In its cross-appeal, the
Estate brings a single issue complaining that the probate court erred in
rejecting its theory that Phillips breached his fiduciary duties in connection
with the sale of certain partnership property in which the Estate had an
interest.  In 1993, Phillips; Poulin; his
wife, Ruth; other Poulin relatives; and six others formed a partnership for the
purpose of acquiring a 9.9-acre tract of raw land at the intersection of
William Cannon Drive and Brodie Lane in Austin. 
Phillips held a 23% interest in the partnership, Poulin 22.5%, Ruth
Poulin 4.5%, Cheryl Poulin 3.3%, Vincent Poulin 1.2%, and the others the
remaining 45.5 %.  Phillips and Poulin
were designated co-managing partners.

                        The probate court heard
evidence that the partnership’s intent was to develop the tract into a
commercial shopping center known as South Cross.  A dispute arose between the partnership and
the City of Austin concerning the applicability of the impervious cover
restrictions of Austin’s Save-Our-Springs ordinance in light of a
grandfathering permit.  The partnership
sued the City, and the parties settled by agreeing that the lots would be
subject to the grandfathered impervious cover rules if development began within
approximately two years.  The probate
court heard evidence that the S.O.S. restrictions, if applicable, would have
destroyed much of the tract’s value as commercial property.

                        The tract was divided
into nine lots.  Five of the lots were
sold before Poulin’s death: two to Walgreens, another to Firestone, another to
Hollywood Video, and another to Bannockburn Church.  The probate court heard evidence that, as the
grandfathering deadline approached, the South Cross partnership faced the
dilemma of having to commence construction on the remaining four lots without
leases in hand in order to beat the deadline and that, furthermore, lenders
would not finance construction unless the partners personally guaranteed the
loan.  Some of the partners wanted to
participate in the deal, which some witnesses termed extremely risky; others
did not.  Consequently, the required
percentage of the South Park partnership voted to sell the property to a new
partnership comprised of the original partners who desired to participate in
the deal—South Park III.[11]  The transaction closed shortly after Poulin’s
death.  Phillips was among the partners
in South Park III, holding a 48% interest, and was designated managing partner.  The Estate, which had opposed the sale, did
not have an interest in the new entity. 
There was evidence that because of a real estate foreclosure in
California, Poulin could not obtain a construction loan or become personally
liable for one.  Further, Ruth Poulin,
the executor of the Estate, did not want to execute a document making her
liable for funds.

                        The Estate alleged that
Phillips breached his fiduciary duties in connection with this
transaction.  It observes that Phillips,
as managing partner of the original South Cross partnership, owed his partners
fiduciary duties of loyalty that have been termed among the highest duties in
law.  See
Huffington v. Upchurch, 532 S.W.2d 576, 579 (Tex. 1976).  Phillips breached this duty, the Estate
claimed, by engaging in self-dealing in this transaction—both executing the
sale on behalf of the original partnership and the purchase by South Cross III,
in his capacities as managing partner of both entities—for his personal
gain.  Specifically, the Estate contends
that the sale price of the property—$1.7 million—was significantly below market
value, meaning that the South Cross III 

class=Section9> 

partners
(including Phillips, who effectively doubled his interest in the property) profited
at the expense of the original partners who, like the Estate, were bought out.

                        In its sole issue, the
Estate asserts that Phillips had the burden to establish the fairness of the
sale price, and that there is legally and factually insufficient evidence to
support the probate court’s implied finding that the price was fair.  To the contrary, the Estate contends that the
only evidence of the property’s value indicates that it had been appraised at
$2.6 million, almost $1 million over the actual sale price.

                        Besides disputing the
Estate’s allocation of the burden of proof,[12]
Phillips points to the following evidence regarding the fairness of the sale
price:

!         The price-per-square foot on the
previously-sold South Cross lots had ranged from approximately $8 per square
foot for the Walgreens and Firestone lots, to over $13 for the Hollywood Video
lot, to $3.45 for the Bannockburn lot. 
By comparison, the price per square foot for the four lots sold to South
Cross III ranged from $9.10 per square foot to $14, or an overall average of
$10.49 per square foot.

 

!                     Testimony that the most
valuable lots on the South Cross tract, in terms of visibility and exposure,
were the Walgreens and Firestone lots.

 

!         Testimony that unless construction on the
South Cross tract commenced before the grandfathering deadline, the
partners—including the Estate—would have been left with property rendered
virtually worthless by the S.O.S. impervious cover restrictions.

 

!         Testimony that the partnership could
cause construction to commence by the deadline only by (1) beginning
construction without leases in hand; and (2) agreeing to be personally liable
on the construction loan.  Thus, the
investment by Phillips and others in South Cross III was considered, in the words
of one witness, to have a “catastrophic” level of risk.

class=Section10> 

! 

                        In contending that there
is nonetheless insufficient evidence that the sale price was fair, the Estate
relies on an unsigned loan commitment letter from Mitchell Mortgage Company
conditioned on the land value of the property being appraised for at least $2.6
million.  There is no direct evidence of
whether the land was, in fact, appraised for that value, however.  Nor is there proof that Mitchell Mortgage
ultimately provided the financing for the project, from which it might have
been inferred that an appraisal of the required value had been obtained.

                        We conclude that the
evidence was legally and factually sufficient to support the probate court’s implied
finding that the sale price of the South Cross property was fair.  We overrule the Estate’s issue.

                        We affirm the judgment
of the probate court.

 

 

                                                                        __________________________________________

                                                                        Bob
Pemberton, Justice

Before
Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed:   October 12, 2007











[1]
 Phillips v. Estate of Phillip O. Poulin,
No. 03-05-00098-CV (Tex. App.—Austin Oct. 12, 2007, no pet. h.).





[2]  Phillips claimed that the additional amount
reflected his disproportionate work efforts in connection with certain
management contracts for which he, and not Poulin, was responsible.





[3]  Specifically, the total salary Poulin
received between December 1997 and November 1998—including his $11,300 check on
September 1—as reflected in Y&O’s general ledger corresponds precisely to
the total amounts that Phillips’s spreadsheet and related testimony indicated
that Poulin received during the same period.





[4]  In other words, Phillips’s $9,000 share from the
stock sale did not “count against” his Y&O salary share, while Poulin’s
did.  The effect, under the Estate’s
theory, was that Phillips both pocketed his $9,000 share of the stock sale and
contrived a claim against Y&O (and Poulin) for $9,000 more in salary to
offset the amount the Y&O books showed that Poulin had received.





[5]  Phillips presents a total of three
issues.  His second issue concerns his
breach-of-fiduciary-duty claim, and includes three subparts, each of which
concerns a different theory of recovery under that claim.  For simplicity, we will refer to these
subparts as his second, third and fourth issues.  Similarly, what he has termed his “third”
issue will be identified as the “fifth” issue.





[6]  Phillips insists that the probate court’s
judgment represents damages attributable solely to the mis-classification of
the $11,300 check.  To the contrary, in
the absence of findings of facts and conclusions of law, the judgment will
stand on any legal theory supported by the evidence.  Anderson
Mill Mun. Util. Dist., 2005 Tex. App. LEXIS 7482, at *12.  In attempting to define the appellate issues
more narrowly, Phillips relies on a pre-judgment letter from the probate court
advising the parties, in relevant part, that:

 

The
Court denies Plaintiff’s breach of fiduciary duty claims on the sale of the
partnership property.  The burden is on
the fiduciary to prove reasonableness and fairness when a transaction is deemed
by the fact-finder to be self-dealing. 
The Defendant has met his burden regarding the sales price.  In regards to the breach of fiduciary duty
claim as to the allocation of funds received and charges as draws in the
Y&O, Inc. partnership [sic], the Court finds that Defendant breached his
fiduciary duty by allocating $11,300 ($9,000 salary and $2,300 expenses) as a
salary draw while treating his $9,000 as a dividend.  The Court awards $11,300 to Plaintiff for
Defendant’s breach.

*    *   *

 

The
Court denies any other claims raised by Plaintiff against Defendant. 

 

The
letter concluded by directing the Estate’s counsel to prepare and present an
order for the court’s signature.

 

            Pre-judgment letters of this sort do
not constitute findings of fact and conclusions of law and are not competent
evidence of a trial court’s basis for judgment.  See Cherokee Water Co. v. Gregg
Co. Appraisal Dist., 801 S.W.2d 872, 878 (Tex. 1990) (observing that the
trial court “could have disregarded the evidence at the time judgment was
actually signed” and that such a letter “is not a finding of fact” as
contemplated by the Texas Rules of Civil Procedure); Mondragon v. Austin, 954 S.W.2d 191, 193 (Tex. App.—Austin 1997,
pet. denied) (pre-judgment letter “cannot constitute findings of fact and
conclusions of law”) (citing Cherokee
Water Co., 801 S.W.2d at 878 ); see
also Gulf States Util. Co. v. Low, 79 S.W.3d 561, 565 (Tex. 2002)
(post-verdict, pre-judgment letter ruling did not illuminate trial court’s
intended basis for judgment because “it was interlocutory and its terms were
never incorporated into the final judgment”); Tex. R. Civ. P. 296-98
(procedural protections for parties in regard to findings of fact and
conclusions of law).

 

            Phillips also emphasizes that the amount
of damages awarded to Poulin by the probate court—“$11,300 . . . by reason of
[Phillips’s] breach of fiduciary duty”—corresponds to the amount of Poulin’s
September 1, 1998 check.  But the mere
fact that a fact-finder’s damages award corresponds to the amount yielded by a
particular theory does not alone imply that the fact-finder relied on that
theory when a different theory supported by the evidence would yield a range of
damages encompassing the amount awarded. 
See McMillian v. State Farm Lloyds,
180 S.W.3d 183, 201-03 (Tex. App.—Austin 2005, pet. denied).





[7]  Furthermore, as the Estate observes, the
relative income distributions reflected in both the Y&O general ledger and
Phillips’s own spreadsheet are both irregular and inconsistent with the alleged
60-40% split.  These facts are at least
as consistent with the inference that no 60-40% split agreement existed as they
are with the inference that one existed but was not complied with.  See
City of Keller v. Wilson, 168 S.W.3d 802, 813-14 (Tex. 2005).





[8]  This fire was subsequent to the one that
caused the damage Poulin had repaired as general contractor, and occurred in a
different building.





[9]  Phillips sent a similar memo on the same date
to Y&O for $1,458.24 for his services in responding to the Estate’s
discovery in this proceeding.





[10]  Phillips inquired of the bookkeeper, “Did you
render good and valuable service along with myself in dealing with the
plaintiffs’ counsel in this matter?” and “Were you involved in discovery and
interrogatories and producing information for plaintiffs’ counsel?”  To each question, the bookkeeper responded
simply, “Yes.”





[11]  Apparently a South Park II partnership had
been created in connection with sales of the other lots.





[12]  Phillips argues that he and Poulin were
co-managing partners and, therefore, owed the same fiduciary duties to each
other.  We need not address the proper
allocation of the burden of proof here because we conclude that, even if
Phillips had the burden to prove the fairness of the sale price, there was
sufficient evidence to support the probate court’s implied finding that he did
so.